Marc Fenster (SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
rmirzaie@raklaw.com
Neil A. Rubin (SBN 250761)
nrubin@raklaw.com
Jacob Buczko (SBN 269408)
jbuczko@raklaw.com
Ali-Reza Boloori (SBN 271489)
aboloori@raklaw.com
James A. Milkey (SBN 281283)
jmilkey@raklaw.com
James Tsuei (SBN 285530)
jtsuei@raklaw.com
Christian Conkle (SBN 306374)
cconkle@raklaw.com
Qi (Peter) Tong (SBN 300347)
ptong@raklaw.com
Jonathan Ma (SBN 312773)
jma@raklaw.com
Daniel Kolko (SBN 341680)
dkolko@raklaw.com
Mackenzie Paladino (*pro hac vice*)
mpaladino@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-9226

*Attorneys for Plaintiff,*
*VirtaMove Corp.*

RUSS, AUGUST & KABAT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| VIRTAMOVE, CORP.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC<br><br>Defendant. | Case No. 25-CV-00860-NW (lead)<br>Case No. 26-CV-00704-NW (member)<br><br>Honorable Noël Wise<br><br>**PLAINTIFF VIRTAMOVE CORP.'S OPENING CLAIM CONSTRUCTION BRIEF REGARDING '762 PATENT**<br><br>Jury Trial Demanded |

RUSS, AUGUST & KABAT

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. LEGAL STANDARDS ..... 1

III. THE ’762 PATENT ..... 2

IV. ARGUMENT ..... 3

A. ’762 Patent Claim 17 Is Not Indefinite ..... 3

1. “incompatible computer platform in which the first software application is not intended to execute” ..... 3

2. “the second incompatible computer platform” ..... 10

3. “the local operating system libraries” ..... 12

B. Other Disputed Terms of Claim 17 Take Their Plain and Ordinary Meaning ..... 13

1. “processor” ..... 13

2. “normally used to perform a same task” ..... 15

3. “runtime software” ..... 17

4. “modify” ..... 18

5. “process context” (Claim 18) ..... 20

C. Disputes Carried Over From Previous Briefing ..... 24

1. “operating system” / “kernel” ..... 24

2. “service” ..... 25

RUSS, AUGUST & KABAT

## TABLE OF AUTHORITIES

**Cases**

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) ........ 1

*Barrette Outdoor Living, Inc. v. Fortress Iron, LP*,
156 F.4th 1353 (Fed. Cir. 2025) ........ 4

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006) ........ 10, 12

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ........ 2

*In re Downing*,
754 F. App'x 988 (Fed. Cir. 2018) ........ 10

*In re Packard*,
751 F.3d 1307 (Fed. Cir. 2014) ........ 10

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ........ 2

*Lyft, Inc. v. Quartz Auto Techs. LLC*,
Case No. 21-cv-01871-JST, 2022 WL 19975246 (N.D. Cal. Nov. 3, 2022) ........ 10, 12

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) ........ 2, 4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........ 2, 4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........ 24

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ........ 13

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........ 1, 16, 19

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ........ 4

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........ 1, 13, 16, 17

*Williamson v. Google Inc.*,
No. 15-CV-00966-BLF, 2017 WL 3232582 (N.D. Cal. July 27, 2017) ........ 4, 9

**Statutes**

35 U.S.C. § 282 ........ 1

RUSS, AUGUST & KABAT

## I. INTRODUCTION

VirtaMove and Google offer not just competing claim-construction proposals, but very different approaches to claim construction. Google's constructions and indefiniteness theories rely almost exclusively on extrinsic evidence such as websites and dictionaries and are divorced from the patent's intrinsic record, while VirtaMove focuses on the most reliable sources of claim construction evidence: the patent's claims, specification, and file history. Google's indefiniteness theories ask the Court to invalidate claims of the '762 Patent by disregarding intrinsic record, without evidence, such as expert testimony, substantiating that a person of ordinary skill in the art would understand (or misunderstand) the claim scope as Google argues. For the other disputed terms, Google seeks narrowing constructions based on inapposite dictionary definitions and even online articles, with no intrinsic record support—there was no lexicography or disclaimer. Because the intrinsic record readily resolves each dispute between the parties, the Court should reject Google's indefiniteness challenges and decline to adopt Google's proposed constructions.

## II. LEGAL STANDARDS

"[T]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)). The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312. There are only two circumstances where a claim is not entitled to its plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "The standard for disavowal of claim scope is . . . exacting." *Id.* at 1366. "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.*

A patent is presumed valid. 35 U.S.C. § 282. A claim is invalid for indefiniteness if, reading the claim in light of the intrinsic record, a person of skill in the art cannot ascertain its scope with

RUSS, AUGUST & KABAT

reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). But the patent challenger must prove indefiniteness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). A claim is not indefinite if it provides objective boundaries for those of skill in the art. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III. THE '762 PATENT

U.S. Patent No. 7,774,762 (the "'762 Patent"), entitled "System including run-time software to enable a software application to execute on an incompatible computer platform," issued on August 10, 2010, and claims ultimate priority to a group of provisional applications filed in 2003 and 2005. Ex. 1 at cover. The specification recites that the patent is directed to "management and deployment of one or more software applications on one or more computer platforms for which one or more applications was not designed to execute on." *Id.* at 1:28–32.

The patent explains one aspect of the fundamental problem it seeks to address: "computer software applications are typically designed to run on a specific computer platform, and will not run on one it is not designed for." *Id.* at 1:43–45. With conventional systems, allowing the application "to be used on a plurality of different incompatible computer platforms" required the programmer to "design specific versions of their software that are compatible with each specific computer platform and operating system it is to be installed on." *Id.* at 1:45–50.

The patented invention solves that problem, allowing "one or more software applications [to] be run or executed on an incompatible computer platform which heretofore, the applications could not be run on," and "offer[ing] compatibility between some software applications and compute platforms that are not otherwise compatible." *Id.* at 1:51–54, 1:64–66. For example, if the invention is used, "an application designed for execution with Solaris version 8" can be executed on "a Solaris 9 platform." *Id.* at 2:52–54.

The specification describes one preferred embodiment of the invention called a "capsule," which is "[a]n aggregate of files required to successfully execute a set of software applications on a computing platform[, and] . . . . comprises one or more application programs, and associated

RUSS, AUGUST & KABAT

system files for use in executing the one or more processes," but not a kernel. *Id.* at 4:51–64. The specification further explains that "[i]n operation, each capsule utilizes a kernel resident on the server that is part of the OS the capsule is running under to execute its applications." *Id.* at 4:65–67. The capsule contains both application files and files specific to the underlying operating system that the application was designed to execute on. *See id.* at 8:21–32 and Fig. 10.

The capsule thus includes its own copies of the operating system files that the application depends on. '762 Patent at 2:19–25. The application "is able to access its own copy of any given file: executable files, library files, and configuration files," *id.* at 10:61–64, even if the underlying platform (i.e., the platform the capsule is running on) does not have the same operating system files. By arranging for the application to access its own copies of the files, the invention "allows a capsule from one version of an OS to be placed on a platform with a newer version of the same OS." *Id.* at 11:2–3.

In conjunction with the capsule files, preferred embodiments include "[c]apsule runtime (CR) software," which "is used to manage dynamic application state. It does this by filtering system services." *Id.* at 8:62–9:2. For example, "[i]n one embodiment of the invention, platform identity is managed through the use of system service filters. . . . The system service filter modifies one or more values returned by the OS to reflect capsule values rather than OS defined values." *Id.* at 10:5–13. This can include providing predetermined values in place of system-determined values: "The system service filter for uname would modify the value returned for system name from that defined by the OS to a capsule specific value." *Id.* at 10:15–17.

## IV. ARGUMENT

### A. '762 Patent Claim 17 Is Not Indefinite

#### 1. "incompatible computer platform in which the first software application is not intended to execute"

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| a computer platform in which the first software application cannot run without change and in which the first software application is not designed to execute. | Indefinite |

RUSS, AUGUST & KABAT

Google must prove indefiniteness by clear and convincing evidence, just as with any other invalidity theory. *Microsoft v. i4i*, 564 U.S. at 95; *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("Indefiniteness must be proven by clear and convincing evidence."). Google presents no such evidence. In particular, Google fails to present any expert testimony explaining a POSITA's understanding of the term (or purported lack thereof). This lack of evidence is fatal. *See, e.g.*, *Williamson v. Google Inc.*, No. 15-CV-00966-BLF, 2017 WL 3232582, at *10 (N.D. Cal. July 27, 2017) ("Google has not presented clear and convincing evidence showing why these examples would be inadequate," such as "expert opinions on whether one of ordinary skill in the art would be able to determine the scope or meaning of claim 7. Without evidence on this point, Google cannot meet its burden of showing indefiniteness by the clear and convincing standard."). To the contrary, the most important evidence before the Court — the intrinsic record of the patent itself — demonstrates that a POSITA *would* understand the scope and meaning of the claim.

The Supreme Court's foundational test for indefiniteness focuses on POSITA's understanding of the patent claims "read in light of the specification delineating the patent, and the prosecution history." *Nautilus*, 572 U.S. at 901. The Federal Circuit regularly holds claims ***not indefinite*** when the specification and prosecution history provide concrete examples demonstrating the claim limitation. *See, e.g.*, *Barrette Outdoor Living, Inc. v. Fortress Iron, LP*, 156 F.4th 1353, 1367 (Fed. Cir. 2025) (a specification "provides sufficient guidance to permit a skilled artisan to ascertain the claim scope with reasonable certainty" when it "provides numerous examples of structures that" meet the challenged limitation); *Sonix*, 844 F.3d at 1378–80 ("[T]he written description is key to determining whether a term of degree is indefinite"; further analyzing the specification and prosecution history for examples and illustrations of the term's usage).

The prosecution history provides clear guidance about the meaning and scope of the limitation. The applicant explained the invention to the examiner as follows:

> [W]ithout this invention, if the first software application is run on the second computer platform, it ***would not and could not run due to an incompatibility in the operating system resident on the second computer***. And, with this invention, the first software application is enabled to run on ***the second incompatible computer platform***.

Ex. 3 (Dec. 15, 2009 applicant remarks) at 11–12.[1] This confirms that the invention is directed to solving the problem of operating system incompatibilities that would, in the absence of the claimed invention, prevent software applications from running on an "incompatible computer platform."

The applicant further clarified the meaning of the limitation by distinguishing the invention over a prior art reference, Schmidt, because Schmidt disclosed capsules that could *not* run on incompatible computer platforms. *Id.* at 18–31. Specifically, Schmidt disclosed a system in which the computer platform executing the application was required to be substantially identical to the platform the application was designed to execute on. In the applicant's explanation, Schmidt allowed migration from one computer to another, but only "where the new computer is ***binary compatible*** (and where ***the OS is of the same type and the same version***)." *Id.* at 19. As the applicant explained, "Schmidt is not concerned about a difference in the OS of his computing environments." *Id.* The claimed invention, on the other hand, "provid[es] capsule related files that will permit a first application that ***cannot otherwise run on a second computer (platform)*** to be able to run on that platform," i.e., where the first and second computer platforms are not binary compatible and have operating systems with different type and/or version. *Id.*

To explain and clarify its usage of "binary compatible," the applicant quoted a dictionary definition that "binary compatible" "[r]efers to an executable programs [sic] that can ***run without change*** in a different or upgraded hardware platform (CPU)." *Id.* at 20. The dictionary definition focuses on a different nuance or level of compatibility (hardware/CPU compatibility rather than the software/OS compatibility that the invention focuses on) but provides a clear indication of the applicant's usage of "binary compatible": an application and computer platform are *binary compatible* if and only if the application can "run without change" (i.e., without a modification to the application *binary*) in the different computer platform. The invention of the '762 Patent, by contrast, allows "moving a software application designed to run on a first computer platform (computer, having a CPU memory and OS) to a second computer platform that is (binary) incompatible. In this instance the OS is of a different type and version." *Id.* at 20. This statement

[1] All emphases have been added, unless otherwise noted.

supports VirtaMove's proposed construction for the first portion of the claim limitation: "a computer platform in which the first software application cannot run without change."

The patent specification itself also provides illustrations and examples of the scope of the claim term. Consistent with the applicant remarks discussed above, the specification explains the problem the invention is intended to solve and sketches the solution:

> [C]omputer software applications are typically designed to run on a specific computer platform, ***and will not run on one it is not designed for***. Therefore programmers desirous of their software ***to be used on a plurality of different incompatible computer platforms***, have to ***design specific versions of their software that are compatible with each specific computer platform and operating system it is to be installed on***.
>
> It is an object of this invention to provide a system whereby one or more software applications can be run or executed on ***an incompatible computer platform which heretofore, the applications could not be run on***. This provides a significant advantage. It allows a single application that was only executable on a specific computer platform to now be used by a plurality of different computer platforms. Special software applications need not be written, taking weeks, months or years to create and deploy; now ***in accordance with this invention, by providing linkages to libraries and applications, and providing a secure capsule run time environment, software applications can be run on systems where they could not before***.
>
> It is an object of this invention to provide a system which offers compatibility between some software applications and ***compute platforms that are not otherwise compatible***.

'762 Patent at 1:43–67. This passage expressly describes what an "incompatible computer platform" is in the context of the invention: a computer platform other than the specific platform that the software application was designed to be compatible with, and which cannot run the application without modification (or without practicing the claimed invention). It also illustrates the key reason a platform is "incompatible": that it lacks the specific "libraries and [other] applications" required by the application.

The specification provides a fully worked example of a computer platform (Solaris 10) being incompatible with a software application designed for a different platform (Solaris 8), and illustrates how the claimed invention cures the incompatibility:

> An example illustrating a Solaris 8 application that lists directory contents running on a Solaris 10 platform is provided. ***A Solaris 8 "ls" program uses the libraries libc.so.1 and libm.so.1 and requires the executables /usr/bin/ls and /usr/lib/ld.so***. It will access the file /var/ld/ld.config during library initialization. A capsule file set is configured to include at least the Solaris 8 files /lib/libc.so.1,

> /lib/libc/libm.so.1, /usr/bin/ls, /usr/lib/ld.so and /var/ld/ld.config. System service filters are installed for at least open, lstat, fstat and xstat on the Solaris 10 platform. The capsule file set is located in /usr/local/capsules/test on the Solaris 10 platform. From the Solaris 10 platform the Solaris 8 "ls" application is started as a first process in a capsule as defined above. As the Solaris 8 "ls" application executes and accesses the file /lib/libc.so.1 the system service filter for "open" causes the file /usr/local/capsules/test/lib/libc.so.1 to be opened through modification of the pathname. This ensures that ***the correct file, the Solaris 8 version of libc***, is used by the "ls" application ***instead of the incompatible Solaris 10 library from the file /lib/libc***. The same principal [sic] is applied to applications that require control of platform identity.

*Id.* at 11:16–36. As the patent explains, Solaris 10 is incompatible with the exemplary application because it lacks the correct files required by the application. The application was designed to use the Solaris 8 version of libc (the "correct file"), whereas the Solaris 10 platform includes a different version of libc ("the incompatible Solaris 10 library from the file /lib/libc"). The patented invention solves this incompatibility by arranging for the application to use the Solaris 8 version of libc even when executing on a Solaris 10 platform that would otherwise provide the Solaris 10 version of libc. This also illustrates the objective nature of "intended to execute" in the context of the patent, which reflects specific files required by the application (here, for example, "the Solaris 8 version of libc"). The application was designed to use those files, which are not present in Solaris 10; thus, the application was not designed to execute in Solaris 10.

Beyond the detailed Solaris 8/Solaris 10 example, the specification gives several other illustrations of the invention's ability to allow an application "designed to work" with one platform to be executed on a different (i.e., incompatible) computer platform. '762 Patent at 2:48–63. In each case, the incompatible computer platform has a different operating system version than the platform the application was designed to work with; in some but not all cases, the operating system is also of a different type.

The parties' agreed construction of "computer platform" to mean "a computer system with a single instance of a fully functional operating system installed" further confirms that the patent is primarily concerned with the operating system aspects of the computer platform, reinforcing the intrinsic record's teaching that an "incompatible computer platform" is a computer system that is incompatible with respect to the operating system and its files. The claim context further confirms that the incompatible computer platform need not and indeed cannot be incompatible with respect



RUSS, AUGUST & KABAT

to the hardware/CPU or the kernel. In particular, the first software application must include "an object executable by a local operating system of the incompatible computer platform." The specification explains that, although the application "is able to access ***its own copy*** of any given file: executable files, library files, and configuration files," it nevertheless "must be ***compatible*** with the underlying kernel on the platform used to host the capsule," because the kernel is "the common dependency for applications." '762 Patent at 10:60–67. The specification goes on to explain why this requirement does not undermine the purpose of the invention: "Backward compatibility of system calls is normally supported by OS distributions. This allows a capsule from one version of an OS to be placed on a platform with a newer version of the same OS." *Id.* at 10:67–11:3. This clarifies, especially to a POSITA familiar with operating system architecture, that the claimed invention is directed to the most common and problematic form of incompatibility, i.e. different operating systems providing different executable files, library files, and configuration files, while exploiting the conventional compatibility of kernels and system calls across different operating systems.

These disclosures confirm that the disputed phrase refers to objective properties of the software application and of the incompatible computer platform. In particular, the word "intended" is used in the claims as a synonym for "designed," referring to the objective properties of the application rather than a subjective purpose or goal of the original programmer. The intrinsic record shows the patentee using "intended" and "designed" interchangeably. For example, non-asserted claim 16 recites "a first software application, which is ***designed*** for execution on a first computer platform," but in a subsequent reference to the same limitation identifies it as "the first software application ***intended*** to be executed on the first computer platform." '762 Patent at 16:66–67, 17:5–6. The two phrases otherwise use identical words and nearly identical syntax ("for execution" versus "to be executed"), confirming that the "designed…" and "intended…" phrases refer to one and the same limitation—that is, in the patentee's lexicon "designed" and "intended" are synonyms. Likewise, the Field of the Invention recites that the invention is directed to the problem of deploying "applications on one or more computer platforms for which one or more applications was ***not designed*** to execute on," using the phrase "designed to execute" in essentially

the same context as claim 17's recitation of "intended to execute." *Id.* at 1:28–32. And nowhere does the intrinsic record distinguish between "intended" and "designed" as having separate meanings.

Google relies on a single dictionary definition for "intend," purporting to establish that "intended" refers to a "plan." Dkt. 165 at ECF page 7 (citing Oxford American College Dictionary); Ex. 5 (Oxford American College Dictionary) at ECF page 5, internal page 693. Google is simply reading the wrong definition. The same dictionary gives a second definition of "intend": "***design*** or destine (someone or something) for a particular purpose or end: *intended for human consumption*." *Id.* The patent's interchangeable usage of "intended" and "designed" confirms that the second definition is the more applicable one, referring to the objective design of the application, not the programmer's plan or wish. Because the word "intended" "does not introduce a subjective intent," and rather indicates the objective *design* of the software, it is not indefinite. *Williamson v. Google Inc.*, 2017 WL 3232582, at *11; *see id.* ("According to Google, only by weighing the subjective intent of the designer would one be able to determine whether there is infringement. . . . [But] when read in light of the specification and the prosecution history, the requirement that the claims implicate subjective intent is nowhere to be found.")

The intrinsic record, in short, confirms that both aspects of the claim phrase refer to objective, observable properties of the application and computer platform themselves, not to anyone's subjective plan. As shown most clearly in the prosecution history, "incompatible" refers to the inability of the computer platform to run the application without change, with the claimed invention providing the necessary changes (e.g. providing the second group of files associated with the required operating system and executing the claimed runtime software). And "not intended to execute" refers to objective aspects of the design of the application itself, such as its dependency on operating system files associated with the first computer platform (e.g. libc, the standard C library, in the specification's Solaris 8/Solaris 10 example).

During the parties' P.R. 4-2(c) meet and confer, Google suggested that the Sony PlayStation 5 video game console, with its ability to play some but not all games originally written for the PlayStation 4, illustrated an ambiguity in the scope of the "incompatible" term, because



RUSS, AUGUST & KABAT

original PlayStation 4 games plainly could not have been "intended" (or "designed") to run on the PlayStation 5 if the games were written before the newer console was released. But the hypothetical, thus stated, is easily resolved. If a given PlayStation 4 game can run without modification (e.g., without practicing the claimed invention) on the PlayStation 5—if they are binary compatible with each other—then the PlayStation 5 is not an "incompatible computer platform" at all with respect to that game, and the intended/designed limitation does not come into play.

### 2. "the second incompatible computer platform"

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| the incompatible computer platform | Indefinite. |

Google's only indefiniteness argument is that "the second incompatible computer platform" lacks antecedent basis, *i.e.*, that there is no "second incompatible computer platform" defined earlier in the claim. Dkt. 165 at ECF page 37. But lack of an explicit antecedent basis does not render a claim term indefinite where, as is the case here, the claim is reasonably understood by a POSITA. *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006); *Lyft, Inc. v. Quartz Auto Techs. LLC*, Case No. 21-cv-01871-JST, 2022 WL 19975246, at *7–*8 (N.D. Cal. Nov. 3, 2022) (ruling claim term "the event" was not indefinite despite lacking antecedent basis after finding that a POSITA would reasonably understand the meaning of the claim in view of the specification); *see also In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (citing *In re Packard*, 751 F.3d 1307, 1310, 1314 (Fed. Cir. 2014)) (recitation of "the end user" did not render claim indefinite where the claim language was clear that only one "end user" was referenced) (non-precedential).

A POSITA would understand with reasonable certainty that the "second incompatible computer platform" refers to the "incompatible computer platform" (and the second "computer platform") recited in the preamble. There is no other "incompatible computer platform" that could conceivably (let alone reasonably) confuse a POSITA. The preamble, which the parties agree is limiting, recites that the "first software application" "is designed for execution on a first computer platform." '762 Patent, cl. 17. The preamble then recites "a method of executing" that software



RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

application "on an incompatible computer platform in which the [] software application is not intended to execute." *Id.* This "incompatible computer platform includ[es] a processor, an operating system including a local kernel . . ., and a set of associated local system files compatible with the local kernel and the processor[.]" *Id.* In limitation "b)," the claim specifies that the first software application is "execut[ed] … on the incompatible computer platform." *Id.* Limitation "c)" further recites "executing . . . runtime software for managing a dynamic state and file location of the first software application," but states that this "executing" is "on the second incompatible computer platform." A POSITA would understand that "the second incompatible platform," which executes the runtime software, is the "incompatible computer platform," which executes the first software application. It does not make sense to have runtime software for managing a dynamic state and file location of the first software application run on a different computer platform than the platform on which the first software application is being executed.

The specification is in full accord and leaves no doubt this is the correct understanding. The patent consistently describes the runtime software running on the incompatible computer platform that executes the software application. *See, e.g.*, '762 Patent at 3:9–18 ("capsule runtime software" running on the "incompatible computer platform"), 3:19–33 (explaining embodiment wherein "runtime software" is on the computer platform that is "incompatible" with the software application), 3:34–4:7, 8:62–64 (explaining that the capsule runtime software is installed on a platform that will host a capsule, i.e., the "incompatible computer platform").

Finally, the prosecution history of the '762 Patent also confirms this understanding. As noted above, the applicant explained the invention to the examiner as follows:

> [W]ithout this invention, if the first software application is run on the second computer platform, it ***would not and could not run due to an incompatibility in the operating system resident on the second computer***. And, with this invention, the first software application is enabled to run on ***the second incompatible computer platform***.

Ex. 3 at 11–12. This statement makes clear that "the second incompatible computer platform" and the "incompatible computer platform" recited in the claims are one and the same.

In sum, the claim language and the specification both leave no question that the "second incompatible computer platform" refers to the "incompatible computer platform" recited in the preamble.

**3. "the local operating system libraries"**

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | Indefinite. |

The phrase "the local operating system libraries" has a clear meaning in the context of claim 17, referring to the one or more libraries of the local operating system, i.e., the operating system running on the "incompatible computer platform."

As with the preceding term, Google's sole indefiniteness argument is that "the local operating system libraries" lacks antecedent basis, i.e., that "***the*** local operating system libraries" does not refer back to an earlier recitation of "local operating system libraries." Dkt. 165 at ECF page 37. But lack of an explicit antecedent basis is not grounds for indefiniteness if, as is the case here, the claim is reasonably understood by a POSITA. *Energizer*, 435 F.3d at 1370; *Lyft*, 2022 WL 19975246, at *7–*8.

The meaning of "the local operating system libraries" is clear in the context of the claim language and the specification. Initially, Google agrees that "a local operating system" and "the local operating system" in claim 17 refer to the same entity. Dkt. 165 at ECF page 6. The preamble states this "local operating system" is an operating system of the "incompatible computer platform" and includes "a local kernel." '762 Patent at 17:32–34. The disputed phrase—"the local operating system libraries"—refers to libraries of the same "local operating system," i.e., to libraries of the operating system of the "incompatible computer platform."[2]

The specification supports this understanding, by teaching that the operating system provides "application libraries." *Id.* at 10:54–56. The patent also gives examples of such operating system "libraries," e.g., "shared libraries" that are system files that are available to applications. *See id.* at 5:10–29. In the embodiment having a Solaris 8 application run on a Solaris 10 platform

[2] Similarly, "the district court rulings" would refer to the rulings of the district court, and "the trial court findings" would refer to findings of the trial court.

(the incompatible computer platform), the specification refers to the "Solaris 10 library" and explains that the Solaris 8 application uses its own version of files rather than the version from the Solaris 10 library.

Against this intrinsic record, a POSITA would reasonably understand that "the local operating system libraries" means the libraries (collections of files) of the local operating system.

### B. Other Disputed Terms of Claim 17 Take Their Plain and Ordinary Meaning

#### 1. "processor"

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | physical computer processor |

The central dispute between the parties is whether the "a processor" recited in claim 17 can only be a "physical computer processor" (as Google contends) or instead may be other types such as a virtual computer processing unit ("vCPUs"). Notably, Google ***does not*** contend that the "plain and ordinary meaning" of "processor" is a "a physical computer processor"; instead, it seeks to construe "processor" narrower than its plain and ordinary meaning, limiting the term to a "physical computer processor" embodiment. Dkt. 165 at ECF page 9. This limiting construction should be rejected because nothing in the intrinsic record overcomes the "heavy presumption" that the claim term's plain and ordinary meaning applies. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).

A claim term typically can be narrowed from its plain and ordinary meaning in only two cases: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365; *Omega Eng'g*, 334 F.3d at 1323. Neither scenario applies here.

And Google's own patents and patent applications confirm that the plain meaning of "processor" ***includes*** a virtual processor. For instance, U.S. Patent No. 10,567,839, assigned to Google, states that "a ***processor*** 350 ***may comprise a virtual processor*** executed by a physical processor." Ex. 6 at 18:17–28. And U.S Patent No. 9,223,596 assigned to Google shows that processors may be virtual processors, not having a 1:1 relationship to physical processors. Ex. 7 at 2:20–25 ("Virtual machines are software implemented versions of computing devices…. [O]ne or

more processors in a virtual machine may correspond to one or more real processors on a real computer. However, this may not be a 1:1 relationship."). And WO 2024/059135 A1 assigned to Google makes clear that a processor may be implemented as a "software module," including in the context of Google Cloud Services. Ex. 8 at [0045] ("[A] software module may be a ***software instance that operates as a processor***, namely a virtual processor whose underlying operations is based on a physical processor such as virtual processor instances for… Google Cloud Services platform. . . .").

The '762 Patent specification does not define the "processor" as a "physical computer processor" or impose any "physical" requirement. The specification shows that the "processor" executes the operating system, *see,* e.g., '762 Patent at 2:13–18, which is consistent both with a physical computer processor and a virtual processor. Nor does the prosecution history of the '762 Patent indicate that the patentee disclaimed the full scope of the plain and ordinary meaning of "processor."

Google's reliance on extrinsic evidence, *see* Dkt. 165 at ECF pages 9–13, is unavailing. This extrinsic evidence contradicts Google's own representations to the USPTO, as noted above, which make clear that the plain meaning of processors *includes* software implementations and virtual processors, even as applicable to the Google Cloud Services category of products that the accused products fall within. *E.g.*, Ex. 8 at [0045]. Furthermore, even Google's own *American Heritage College Dictionary* shows that a "processor" is "A computer," which Google again acknowledges can be non-physical. Dkt. 165 at ECF pages 9–13. *See also* Ex. 7 at 2:39–40 ("Virtual machine 102 may be a software implemented version of a computer."). And nothing in the specification or file history justifies deviating from the plain and ordinary meaning of "processor" which includes all varieties of processors (not merely physical processors), because the patent does not provide any statements excluding or disclaiming virtual or software-implemented processors. Google's attempt to redefine "processor" inconsistently with Google's own understanding of that term when it seeks to obtain intellectual property rights (rather than defend against them) should be rejected.

**2. "normally used to perform a same task"**

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. Alternatively: "that would be used to perform a same task if the second group of files were not used to perform the same task" | that would be used if the corresponding capsule files were not present |

This term needs no construction—the specification uses the term's ordinary meaning, and there is no other definition of the term or any disavowal of its full scope. By contrast, Google's proposed construction is overly narrow and contradicts the specification.

The basic invention of the '762 Patent is a system/method whereby a software application designed for one computer platform can be executed on a second, "incompatible computer platform" on which the application could not ordinarily run. *See* '762 Patent at 1:51–64, 2:48–62, 4:48–50 (defining "computing platform"). To accomplish this objective, the application is "encapsulated" so as to be substantially independent of the underlying computing platform. *Id.* at 10:37–45. The encapsulated application includes "its own copy of any given file: executable files, library files, and configuration files" required for the application to execute on the "incompatible computer platform." *Id.* at 10:60–64. The patent describes several examples: in one, an encapsulated application originally designed for a Solaris 8 computing platform uses "the same files it would use on its original (Solaris 8) platform" regardless of which "incompatible computer platform" its encapsulated version runs on. *Id.* at 11:4–15. In another example, wherein a Solaris 8 application is encapsulated to run on a Solaris 10 platform, the capsule uses the Solaris 8 version of needed files (e.g., /usr/local/capsules/test/lib/libc.so.1) as opposed to the Solaris 10 version of the same files (e.g., /lib/libc.so.1). *See id.* at 11:16–36. Both embodiments share the feature that the application uses its own version of files that also exist on the incompatible operating system.

Method claim 17 recites this same feature: "in the execution of the first software application on the incompatible computer platform using said second group of files in place of the associated local system files ***normally used to perform a same task***, which are resident on the incompatible computer platform as part of the operating system." '762 Patent, cl. 17 (emphasis added). The meaning of this limitation is clear to a person of ordinary skill in light of the

specification: the "second group of files" corresponds to the application's own version of files, and the "associated local system files normally used to perform a same task" corresponds to the different versions of the same files that reside on the operating system of the incompatible computer platform. Google has identified ***no intrinsic evidence*** that supports its construction (Dkt. 165 at ECF pages 25–29), let alone evidence of lexicography or disavowal. The term's plain and ordinary meaning therefore applies. *Thorner*, 669 F.3d at 1365 (plain and ordinary meaning applies unless patentee provides another definition or disavows the full scope of the term).

If any construction of "normally used to perform a same task" is necessary (and it is not), VirtaMove respectfully submits that it should be "that would be used to perform a same task if the second group of files were not used to perform the same task." This construction makes sense in the context of the specification: if a task were to be performed by a version of the application running directly on the host operating system (rather than by the encapsulated application) and thus the "second group of files" were not used to perform the task, then the files on the host operating system would be used in place of the "second group of files." *See Phillips*, 415 F.3d at 1312–1313; *id.* at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (citation omitted).

Google's construction conflicts with other claim language because it refers to "the corresponding capsule," but claim 17 nowhere recites or references a "capsule." Google's construction finds no support in the intrinsic or extrinsic record, and indeed appears to be nonsensical. Specifically, Google provides no explanation for what is meant by "corresponding capsule files," a term which is found nowhere in the specification or asserted claims. Indeed, claim 17 does not even recite a "capsule" at all (much less "capsule files" or "corresponding capsule files"). Given that Google's construction introduces a term that has no antecedent basis (express or implicit), it would serve only to confuse the jury and should be rejected.

**3. "runtime software"**

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | engine that provides services to managed software |

Google once again seeks to narrow a claim term without any supporting limiting lexicography or disclaimer in the specification. Google's proposed construction should be rejected, and "runtime" software should be accorded its ordinary meaning which is also used in the '762 Patent, i.e., software that "manage[s] dynamic application state," e.g., by providing access to the set of files in a capsule containing the application and monitoring processes. *See* '762 Patent at 8:32–34, 8:67–9:2, 12:36–38. The "runtime software" filters system services and has services that "support system service filters both in user mode . . . within the capsule environment, and in kernel mode as a kernel module[.]" *Id.* at 6:23–26. As explained below, this exactly parallels the claim requirements.

Google identifies nothing in the specification that provides another or narrower definition or scope for "runtime software." *Thorner*, 669 F.3d at 1365 (a term's plain and ordinary meaning applies unless patentee provides another definition or disavows the full scope of the term). The specification does not even use the terms "engine" and "managed software," let alone refer to "runtime software" as an engine that provides services to managed software. To the contrary, the specification's primary discussion of "runtime software" confirms that the "runtime software" is generally software that has the characteristics the claims attribute to that software, with no mention of the runtime software being an "engine" or "provid[ing] services to managed software" as Google inaccurately proposes:

> In accordance with a broad aspect of the invention a system is provided… comprising: … **runtime software for managing a dynamic state and file location of the first software application, the runtime software including a kernel module resident in kernel mode and at least one application filter library resident in user mode for filtering one or more system service requests made by the first software application and for providing values from the at least one application filter library which is provided in addition to the local operating system libraries to modify values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application** . . . .

’762 Patent at 3:34–4:7 (bolded language corresponds ***exactly*** to claim language of claim 17); *id.* at 2:1–36 (similar description for “capsule runtime software”). In addition, other descriptions of the “runtime software” in the specification closely correspond with its description in the claim itself. For instance, the specification’s description further states that “execution of the first software application requires access of files from first set of files in place of operating system files and wherein predetermined values are provided instead of values related to the identity of the incompatible computer platform,” (*id.* at 4:3–7), which matches the claim’s description that “executing the first software application by accessing files from first set of files in place of operating system files and wherein predetermined values are provided instead of values related to an identity of the incompatible computer platform.”

All of these characteristics of the “runtime software” set forth in the specification thus closely track the characteristics the claim itself assigns to such “runtime software.” In contrast, none of Google’s alleged requirements of runtime software are found anywhere in the specification or claim language.

Finally, Google’s apparent reliance on extrinsic evidence—the dictionary definition of “common language runtime” (Dkt. 165 at ECF pages 29–30)—is inapposite. That definition relates to runtime used for “managed code,” which is a different concept not addressed in the ’762 Patent.

In sum, nothing in the specification warrants departing from the plain and ordinary meaning of “runtime software,” and the Court should reject Google’s attempt to inject the requirement that runtime software be an “engine” that provide services to “managed software.”

### 4. “modify”

| VirtaMove’s Proposed Construction | Google’s Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | make partial or minor changes to |

This term should take its plain and ordinary meaning because that is how the patent uses it to describe the invention. In relevant part, claim 17 recites:

> . . . the runtime software including . . . at least one application filter library resident in user mode and filtering one or more system service requests made by the first software application and providing values from the at least one application filter library which is provided in addition to the local operating system libraries[,] ***to modify values that otherwise would have been returned by the local operating***

> ***system in the absence of said filtering one or more system service requests from the first software application*** . . .

'762 Patent, cl. 17 (emphasis added). That is, at least one "application filter library" must "filter[]" "system service requests" made by the "first software application" and "modify values that otherwise would have been returned by the local operating system" (*i.e.*, that of the incompatible computer platform) "in the absence of said filtering." The parties dispute whether "modify" should be accorded its plain and ordinary meaning, *i.e.*, to alter or to change (as VirtaMove contends), or construed more narrowly as "make partial or minor changes to" (as Google does).

There is no dispute that "modify" *includes* a mere "partial or minor change." But it is not ***limited*** to partial or minor changes in light of the specification and the ordinary meaning of the word. The specification teaches that the "system service filter ***modifies*** one or more [platform identity] values returned by the OS to reflect capsule values ***rather than*** OS defined values." *Id.* at 10:9–11. In other words, the OS-defined values are replaced with capsule values. The patent identifies several examples of modifications—system name, node name, release, version, machine (*id.* at 10:5–17), "a subset of the system files," or even contents of files or directories to add or remove pieces of information (*id.* at 12:42–57). Nothing in the patent teaches that these modifications are merely "partial" or "minor" changes. *See id.* at 10:5–17. As another example, the patent elsewhere teaches that ***any*** "customization" made to the original operating system of the application (e.g., addition of folders or changes to file content) "can be imported and made available" to the application capsule that is hosted on the incompatible computer platform. *See id.* at 11:37–46. The patent never states that these modifications to file content or folders are limited to "partial" or "minor" changes.

Google's reliance on a definition from *The Oxford American College Dictionary* (2002) does not trump the meaning of "modify" in the context of the specification. *Phillips*, 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). Besides, other dictionaries define "modify" more broadly. For example, Merriam-Webster identifies one meaning of "modify" as "mak[ing] basic

or fundamental changes . . . to serve a new end." Ex. 4 (Merriam-Webster Dictionary definition of "modify," *available at* https://www.merriam-webster.com/dictionary/modify).

In sum, "modify" need not be limited to "partial or minor changes."

**5. "process context" (Claim 18)**

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | the running state of a program, including its address space |

Google's proposed construction for this term yet again disregards the clear intrinsic record evidence that "process context" has a plain and ordinary meaning and is used in its ordinary sense. Instead, Google imports an extraneous and potentially confusing definition derived from an online magazine article. The construction does not make sense in context: Google would have claim 18 recite that the application filter library "is executed in a same the running state of a program, including its address space, as a process which requests a service."

The imported phrase "running state of a program" has no obvious relationship to any of the inventive concepts claimed or described in the specification. "A program" is not a claim term and has no obvious referent. The word "state" invites unwarranted confusion with the distinct claim limitation "managing a dynamic state and file location of the first software application," by the claimed runtime software, in contrast to Claim 18's requirement that the application filter library (a portion of the runtime software) *executes* in a same process context as a process which requests a service. (There is no suggestion that the claimed "a process" of Claim 18 is a reference to the claimed "first software application.")

Google's addition of "address space" into the "process context" construction also invites confusion with Claim 19, which requires that the application filter library *reside in* a same address space as an application. Under Google's construction, claim 18 would require in relevant part that the application filter library "is executed in a same… address space" as an application. Claim 19 correctly reflects the intrinsic record's use of "address space" as somewhere a library resides, not part of a process context or where a process is executed. *See, e.g.*, Ex. 2 (U.S. Patent 7,784,058) at 6:51–53 ("The shared library files are placed in an address space that is accessible to multiple



RUSS, AUGUST & KABAT

applications") (for the relevance of the '058 Patent, see the following paragraph). The '762 Patent specification in fact directly contrasts "address space" and "process context" as distinct concepts:

> This library is loaded into memory in the same local operating system defined virtual ***address space*** as the application associated with a capsule and requesting a system service. System service filters embodied in the application filter library execute in the same local operating system defined ***process context*** as the application associated with a capsule and requesting a system service.

Ex. 1 ('762 Patent) at 14:64–15:4. This furthermore illustrates that the process context is, in at least this embodiment, defined by the local operating system, not "the running state of a program."

The intrinsic record uses "process context" and related phrases consistently in their plain and ordinary sense, and not according to Google's incorrect construction. The '762 Patent is a continuation-in-part of Application No. 10/946,536, which issued as U.S. Patent No. 7,784,058; the specification of the '536 application (i.e., the specification of the '058 Patent) is incorporated by reference into the '762 Patent. '762 Patent at 1:13–24. The '058 Patent specification (which forms part of the '762 Patent due to the incorporation by reference) confirms that the patentee used "process context" in its plain and ordinary sense, indicating the context of an individual process.

The '058 Patent specification uses the phrase "process context" to refer to the context of an individual process (e.g. application or service). The specification explains that ovals in the figures each represent "a different context," such as an "application context." '058 Patent at 7:12–20. Figures 2a and 2b depict two conventional arrangements of what the '058 Patent calls "critical system elements," where "the essential difference" between the two figures is "the use of a single ***process context*** [in Figure 2b] to contain all user mode critical system elements." Figure 2a, by contrast, has each critical system element use its own process context; the "brief description" of Figure 2b explains that it "is illustrative of a known system architecture where critical system elements execute in user mode and execute in [a] distinct ***context*** from applications in a single ***application process context***." *Id.* at 5:5–8. The two figures are shown below:



RUSS, AUGUST & KABAT




**FIG. 2a**
**Prior Art**




**FIG. 2b**
**Prior Art**

’058 Patent, Figs. 2a, 2b. Figure 2a shows four process contexts: one for each application and one for each critical system element. Figure 2b shows three process contexts: one for each application, and one for both critical system elements.

The ’058 Patent specification goes on to illustrate the use of software libraries *within* a process context, in contrast to both of the prior art arrangements. Figure 4 shows a single process context (again illustrated with an oval), labeled “user process,” containing an application 42, an application library 44, an extended library 45, and critical system elements 47. ’058 Patent Fig. 4. The specification explains that extended library 45 and critical system elements 47 correspond to “shared libraries,” and goes on to explain the significance of placing the critical system elements in shared libraries: “These functions can be directly called by the applications 42 and as such can be run in the same context as the applications 42.” ’058 Patent at 8:31–35. Figure 4 shows a stark contrast to Figures 2a and 2b: now the critical system elements are *within* the process context:








RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

The use of shared libraries to place critical system elements within the process context of an application is a key aspect of the ’058 Patent’s invention. The patent title itself highlights using “critical system elements as shared libraries,” and the specification emphasizes the central role of the process context within the claimed invention: “An important distinction between this invention and prior art systems and architectures is the ability to allow a CSE to execute in ***the same context*** as an application.” ’058 Patent at 1:46–48. The specification summarizes the invention by describing “a shared library… for use by the software applications in user mode executing in the context of the application.” *Id.* at 1:60–64.

Both the ’058 and ’762 Patents briefly explain the importance and benefits of running in the same process context as the application; the brevity of the explanations presumably reflects that “process context” was a familiar and well-known concept. The ’058 explains, in connection with the Figure 2a prior-art embodiment where critical system elements are *not* in the application’s process context, that communicating between “two application contexts” requires the mediation of the kernel, which “may result in poor performance.” ’058 Patent at 7:30–50. As this illustrates, the application accessing elements outside its own context requires coordination from the operating system kernel. The use of a shared library, on the other hand, does not require this, because the shared library is located within the application’s own process context. The requirement of switching back and forth through the kernel causes “poor performance.” The ’762 Patent contains a similar explanation of what it means to be outside an application’s process context:

> Application processes utilize kernel services to perform operations outside of their ***process context***. This includes access to hardware, communication with other processes hosted by the same kernel, communication outside the platform, allocation of memory; any processes that extend or transcend the given ***process context*** passes through the kernel. These kernel services are accessed through system calls.

’762 Patent at 6:6–13. This describes the same problem of cross-process communication described in the ’058 Patent: when a process needs to “extend or transcend” its process context, for example by communicating with other processes, that request must go through the kernel. The similarity between these two discussions furthermore confirms that the ’058 Patent’s “context” and the ’762 Patent’s “process context” refer to the same thing.

### C. Disputes Carried Over From Previous Briefing

#### 1. "operating system" / "kernel"

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | **"operating system"**: the software that controls the allocation and usage of hardware resources such as memory, central processing unit (CPU) time, disk space, and peripheral devices<br>"kernel": the core of an operating system—the portion of the system that manages memory, files, and peripheral devices; maintains the time and date; launches applications; and allocates system resources |

These identical terms were previously briefed regarding the '814 Patent. *See* Dkt. Nos. 63, 65, 66, and 72. The parties agreed not to present new briefing of these terms. However, to avoid undermining the Court's page limits by purporting to incorporate the previous briefing by reference, VirtaMove reiterates its argument below, unchanged from Dkt. 65:

Each of these terms has a plain and ordinary meaning, and the specification and claims of both the '814 and '058 Patents uses the terms in their plain and ordinary sense. Google admits that "the asserted patents use 'operating system' and 'kernel'/'operating system kernel' according to their conventional meanings." Dkt. 63 at 4. There is no reason to engage in redundant, unhelpful construction of these terms.

Google's basic argument is that construction is necessary because VirtaMove does not agree to Google's demand to insert additional, redundant, confusing language glossed from a Microsoft publication. That is not the law. The Court's obligation is to resolve actual disputes "regarding the proper ***scope*** of these claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (emphasis added). Google does not and cannot identify any dispute regarding the scope of either of these terms. VirtaMove opposes construction because these are poor definitions that will be confusing, not helpful, to a jury. For example, the extraneous non-limiting examples ("such as…"; "memory, files, and peripheral devices…") provide, at best, context rather than defining the metes and bounds of the claim scope. As another example, it is well known that software ***other*** than operating systems can "control the allocation and usage of hardware resources such as memory," as it is common for individual applications to have their own memory management capabilities. Because these terms have a plain meaning, and further



RUSS, AUGUST & KABAT

because Google's proposals fail to accurately capture this plain meaning, Google's proposed constructions should be rejected.

**2. "service"**

| VirtaMove's Proposed Construction | Google's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | specialized, software-based functionality provided by network servers and comprised of one or more applications |

As with the previous terms, the parties agreed not to present new briefing regarding "service." VirtaMove's prior argument on this term from Dkt. 65 is presented below verbatim:

As with "operating system," Google again simply demands to insert a redundant definition of the ordinary word "service," taken from a commercial publication from Microsoft, without identifying any reason for the construction.

"*specialized*": There is no basis to limit the scope of "service" to only "specialized" services. It is not clear what Google believes "specialized" means here, but the patent specification plainly discloses that the invention extends to all services, not merely specialized services. The patent specification states that "Examples of specific services include ***but are not limited to*** CRM (Customer Relation Management) tools, Accounting, and Inventory" ('814 Patent at 7:16–51); other examples in the specification include the remote login service "ssh" (*id.* at 10:49–50), and an "accounting/payroll service" (*id.* at 16:11–16). None of these are necessarily "specialized."

"*provided by network servers*": This phrase is confusing at best. "Servers" is a claim term, and the existing claim language recites a specific relationship between servers, containers, applications, and services.

"*comprised of one or more applications*": Setting aside the nonstandard usage "comprised of," this phrase confuses the claimed relationship between applications and services. The claim recites that each container comprises one or more executable applications, that the applications are "related to a service," and that the applications "each include an object executable… for performing a task related to the service." '814 Patent cl. 1. It is the container, not the service, that comprises applications.



RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

Dated: August 7, 2026

Respectfully,

/s/ Reza Mirzaie
Marc Fenster (SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
rmirzaie@raklaw.com
Neil A. Rubin (SBN 250761)
nrubin@raklaw.com
Jacob Buczko (SBN 269408)
jbuczko@raklaw.com
James A. Milkey (SBN 281283)
jmilkey@raklaw.com
James Tsuei (SBN 285530)
jtsuei@raklaw.com
Christian Conkle (SBN 306374)
cconkle@raklaw.com
Qi (Peter) Tong (SBN 300347)
ptong@raklaw.com
Jonathan Ma (SBN 312773)
jma@raklaw.com
Daniel Kolko (SBN 341680)
dkolko@raklaw.com
Mackenzie Paladino (*pro hac vice*)
mpaladino@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-9226

*Attorneys for Plaintiff,*
*VirtaMove Corp.*