HOGAN LOVELLS CADWALADER US LLP
David A. Perlson (CA SBN 209502)
david.perlson@hlc.com
Antonio Sistos (CA SBN 238847)
ton.sistos@hlc.com
Yiming Gu (CA SBN 364089)
yiming.gu@hlc.com
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Telephone: (415) 374-2300

*Attorneys for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

VIRTAMOVE, CORP.,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Case No. 5:25-cv-00860-NW (SVK)
Case No. 5:26-cv-00704-NW (SVK) (consol.)

**GOOGLE LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**
**PATENT L.R. 4-2(b)**

## TABLE OF CONTENTS

**Page**

Background ........................................ 1
Legal Standard ........................................ 3
Argument ........................................ 4
I. Incompatible computer platform in which the first software application is not intended to execute ('762 cl. 17) ........................................ 4
A. "Incompatible Computer Platform" is Indefinite ........................................ 5
B. VirtaMove's Efforts to Rehabilitate "Incompatible Computer Platform" Fail. ........................................ 7
C. "Not Indended to Execute" Is Also Indefinite ........................................ 9
II. Lack of antecedent basis terms: the second incompatible computer platform / the local operating system libraries ('762 cl. 17) ........................................ 11
A. The second incompatible computer platform ........................................ 11
B. The local operating system libraries ........................................ 13
III. Processor ('762 cl. 17) ........................................ 14
IV. Normally used to perform the same task ('762 cl. 17) ........................................ 16
V. Runtime software ('762 cl. 17) ........................................ 18
VI. Modify [values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application] ('762 cl. 17) ........................................ 20
VII. Process context ('762 cl. 18) ........................................ 21
VIII. Overlapping Claim Terms with '814 patent: Operating System / Kernel / Service ('762 cl. 17) ........................................ 23

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Barrette Outdoor Living, Inc. v. Fortress Iron, LP*,
156 F.4th 1353 (Fed. Cir. 2025) ........ 8

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ........ 10

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ........ 5

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
813 F. App'x 522 (Fed. Cir. 2020) ........ 12, 13, 15

*Carnegie Mellon Univ. v. LSI Corp.*,
No. 18-CV-04571-JD, 2025 WL 2323347 (N.D. Cal. Aug. 12, 2025) ........ 16

*In re Downing*,
754 F. App'x 988 (Fed. Cir. 2018) ........ 14

*eCardless Bancorp, Ltd. v. PayPal Inc.*,
No. 24-CV-01054-BLF, 2024 WL 4804975 (N.D. Cal. Nov. 14, 2024) ........ 12

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006) ........ 14

*Fargo Elecs., Inc. v. Iris, Ltd., Inc.*,
287 F. App'x 96 (Fed. Cir. 2008) ........ 13

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ........ 10

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018) ........ 10

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ........ 5, 6, 8

*Lyft, Inc. v. Quartz Auto Techs. LLC*,
Case No. 21-cv-01871-JST, 2022 WL 19975246 ........ 14

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ........ 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........ *passim*

*Netflix, Inc. v. Rovi Corp.*,
No. 11-CV-6591-PJH, 2015 WL 4345326 (N.D. Cal. July 15, 2015), *aff'd*, 670 F. App'x 704 (Fed. Cir. 2016) .......... 17

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) .......... 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .......... *passim*

*Omega Eng'g, Inc, v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... *passim*

*Process Control Corp. v. HydReclaim Corp.*,
190 F.3d 1350 (Fed. Cir. 1999) .......... 12

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed.Cir.1998) .......... 17

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
824 F.3d 999 (Fed. Cir. 2016) .......... 18

*In re Shafovaloff*,
No. 2024-1035, 2025 WL 1779173 (Fed. Cir. June 27, 2025) .......... 9

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......... 9

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed.Cir. 1996) .......... 17

*Warner–Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) .......... 12

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) .......... *passim*

*Williamson v. Google Inc.*,
No. 15-CV-00966-BLF, 2017 WL 3232582 (N.D. Cal. July 27, 2017) .......... 8, 11

*WSOU Invs. LLC v. Google LLC*,
No. 2022-1066, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) .......... 9

**Statutes**

35 U.S.C. § 112 .......... 5

**NOTE ON CITATIONS**

- References to "Compl." refer to VirtaMove's Consolidated Complaint For Patent Infringement Against Google LLC (Dkt. 178).
- The patents-in-suit, U.S. Patent Nos. 7,519,814 ("the '814 patent") and 7,774,762 ("the '762 patent") were attached as Exhibits 1 and 3, respectively, of the Compl. References to the patents-in-suit are listed by column and line number, or by claim number. For example, "'762 cl. 1" refers to claim 1 of the '762 patent. All references are to the '762 patent unless otherwise stated.
- References to "Br." refer to Plaintiff VirtaMove Corp.'s Opening Claim Construction Brief Regarding '762 Patent (Dkt. 185).
- "American Heritage Dictionary" refers to The American Heritage College Dictionary (2002), excerpts of which are attached as Exhibit A.
- "Barron's Dictionary" refers to Barron's Dictionary of Computer and Internet Terms (2006), excerpts of which are attached as Exhibit B.
- "*Microsoft Computer Dictionary*" refers to *The Microsoft Computer Dictionary*, 5th Ed. (2002), excerpts of which are attached as Exhibit C.
- "*Newton's Telecom Dictionary*" refers to *Newton's Telecom Dictionary*, 18th Ed. (2002), excerpts of which are attached as Exhibit D.
- "New Webster's Dictionary" refers to The New Webster's Dictionary of the English Language (2004), excerpts of which are attached as Exhibit E.
- "*Oxford Computer Dictionary*" refers to *The Oxford Dictionary of Computing* (2004), excerpts of which are attached as Exhibit F.
- "*Oxford Dictionary*" refers to *The Oxford American College Dictionary* (2002), excerpts of which are attached as Exhibit G.
- Emphasis in brief are added unless otherwise noted.

Google's constructions follow the meaning to one of skill in the art in the light of the intrinsic evidence, and require objective boundaries for claims. In contrast, VirtaMove ("VM") either manufactures constructions using out-of-context snippets or otherwise proposes "plain and ordinary meanings" for many terms seemingly to allow it to later assert incorrect interpretations of these same terms. The Court should resolve these issues and adopt Google's constructions.

**Background**

VirtaMove currently asserts that Google infringes the '814 patent and the '762 patent in this consolidated case. The parties briefed the '814 patent in 2024 in WDTX before that case was transferred to this Court. Dkt. 88. The Court's Scheduling Order involving the '814 patent (Dkt. 141) does not allow for any further claim construction briefing for that patent, so the parties accordingly treat the WDTX briefing as operative, and those disputes are not separately addressed herein. The '762 patent specification incorporates the '814 patent and the (now dismissed, Dkt. 134) U.S. Patent No. 7,784,058 ('058 patent), both of which the '762 patent is a continuation-in-part. 1:18-24. The '762 patent "relates to management and deployment of one or more software applications on one or more computer platforms for which one or more applications was not designed to execute on." 1:28-32. This "allows a single application that was only executable on a specific computer platform to now be used by a plurality of different computer platforms." 1:55-58.




FIG. 1
Prior Art

According to the patent, each computer platform includes a kernel that is part of the operating system ('058 patent at 5:22-24), and which "controls access to hardware services" such as CPU time, memory, file activity, and network bandwidth. 1:37-40, 7:52-53, 12:31-32; '058 Fig. 1 (above). Application libraries provide access to those operating system services. 7:51-52;

’058 patent at 2:44-45. That is, an application uses application libraries to interact with the kernel to print a file, save a file, access the Internet, etc. 6:3-13. If those application libraries were different than those expected by the application, *e.g.* if the Solaris 8 version of an application were running on Solaris 10, then the corresponding functionality to print, save, go online, etc. may not operate as expected. 11:16-21. The incorporated ’814 patent specification further explains that different applications may require different, mutually exclusive libraries, on the same computer. ’814 patent at 1:38-50. The claimed invention purports to address this problem by having an application execute its own version of an application library in place of the corresponding library provided by the underlying computer platform. 2:25-28, 3:14-18; ’814 patent at 6:59-7:3.

In addition to the “in place of” solution, which is also claimed by the ’814 patent at issue in this case, the ’762 patent further purports to address compatibility issues by adding “filtered system services” to the prior art. *Compare* Fig. 3 (depicting a prior art computer platform) *to* Fig. 5 (depicting the claimed invention); *see also* 7:48-58, 10:27-36. A filter is “called before the original kernel system call handler” and “modifies one or more values returned by the OS” via its kernel. 9:25-27, 10:9-11. Thus, rather than circumventing the underlying operating system libraries, the filters call those libraries and then modify their output to match the output expected by the application. 1:52-55. In this manner, the “filtering” solution can reuse much of the functionality already on the operating system, only modifying it as needed.

VirtaMove asserts that Google infringes independent claim 17 and dependent claims 18-20 of the ’762 patent. All asserted claims of the ’762 patent incorporate both of these purported solutions via independent claim 17. Step 17[b] uses a “second group of files,” that were “provid[ed]” with the “software application” in step 17[a], “in place of the associated local system files normally used to perform a same task.” Step 17[c] “filter[s] [] requests made by the first software application [] to modify values that otherwise would have been returned by the local operating system”:

> 17. In a system having a first software application, which is designed for execution on a first computer platform, a method of executing said first software application on an incompatible computer platform in which the first software application is not intended to execute, said first software application including an object executable by a local operating system of the incompatible computer platform for performing a

> task related to a service, the incompatible computer platform including a processor, an operating system including a local kernel residing on the incompatible computer platform, and a set of associated local system files compatible with the local kernel and the processor of the incompatible computer platform, the method comprising:
>
> a) ***providing*** a computer readable set of first files, comprising a first group of files that include the first software application, designed to execute on the first computer platform and ***a second group of files*** that are distributed with or are specific to an operating system required to execute the first software application;
>
> b) in the execution of the first software application on the incompatible computer platform ***using said second group of files in place of the associated local system files normally used to perform a same task***, which are resident on the incompatible computer platform as part of the operating system, and,
>
> c) executing on the second incompatible computer platform runtime software for managing a dynamic state and file location of the first software application, the runtime software including a kernel module resident in kernel mode and at least one application filter library resident in user mode and ***filtering one or more system service requests*** made by the first software application and providing values from the at least one application filter library which is provided in addition to the local operating system libraries ***to modify values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests*** from the first software application, and executing the first software application by accessing files from first set of files in place of operating system files and wherein predetermined values are provided instead of values related to an identity of the incompatible computer platform.

## <u>Legal Standard</u>

"The words of a claim 'are generally given their ordinary and customary meaning,'" which is their meaning to a "person of ordinary skill in the art in question at the time of the invention" "after reading the entire patent." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-17, 1321 (Fed. Cir. 2005). While it is a "bedrock principle" of patent law that "the claims of a patent define the invention," the specification of a patent "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Id.,* 1312, 1315. The Court also may consult "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.,* 1314. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." *Id.*, 1317. "[W]hile extrinsic evidence can shed useful light on the relevant art, [] it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (cleaned up). "It is highly disfavored to

construe terms in a way that renders them void, meaningless, or superfluous." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) ("claim language should not [be] treated as meaningless").

Under 35 U.S.C. § 112, ¶ 2, the claims must "particularly point[] out and distinctly claim[] the subject matter which the [inventor or a joint inventor] regards as the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A] patent does not satisfy the definiteness requirement of § 112 merely because 'a court can ascribe *some* meaning to a patent's claims.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (*quoting Nautilus*, 134 S.Ct. at 2130). "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Id*. Accordingly, claims must define the scope of the invention with "reasonable certainty" and provide "clear notice" of what is claimed, "appris[ing] the public of what is still open to them." *Nautilus*, 572 U.S. at 901, 909-10. Indefiniteness renders a claim invalid, and the Court may not rewrite claims to preserve their validity. *Id.* at 902.

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). That is because "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362. It is thus improper to submit the parties' arguments regarding the meaning and legal significance of a claim limitation to the jury. *Id.*

## Argument

### I. *Incompatible* computer platform in which the first software application is not *intended* to execute ('762 cl. 17)

| | |
|---|---|
| **Google**: Indefinite | **VM**: a computer platform in which the first software application cannot run without change and in which the first software application is not designed to execute |

Claim 17 recites "a method of executing said first software application on an incompatible computer platform in which the first software application is not intended to execute." The parties agree a computer platform is "a computer system with a single instance of a fully functional operating system installed." Dkt. 165 at 3; *see also* Br. 7. The parties also agree that this limitation requires both (1) using an "incompatible" computer system with a single instance of a fully functional operating system installed, and (2) that this "incompatible" computer system be one in which the application is not "intended" to execute– that is, that the claim limitation imposes two requirements, not one requirement stated two ways. Br. 9; *see also Wasica*, 853 F.3d at 1288. Throughout its brief, VirtaMove emphasizes that this aspect of the invention is fundamental. Br. 2, 4, 6. But because a person of skill in the art could not determine the objective boundaries of what it means for (1) the computer platform to be "incompatible" or (2) for the application to be not "intended" to execute, with reasonable certainty, the claims are indefinite. *Nautilus*, 572 U.S. at 901; *Interval Licensing*, 766 F.3d at 1371. VirtaMove's construction is contradicted by the claims and specification and does not fix the indefiniteness issues in any event.

### A. "*Incompatible* Computer Platform" is Indefinite

As Google showed in the claim construction briefing for the related '814 patent (Dkt. 63 at 4-5; Dkt. 66 at 1-2) operating systems include a component called a "kernel," which is responsible for launching applications in that operating system. If an application functions with the operating system kernel, then it can be launched by that operating system. If it does not, then it cannot. Other prior art systems install "multiple [] operating system images" – including their kernels – on a platform, allowing that platform to run applications from multiple operating systems. '814 patent at 1:53-56. This is not disputed. Dkt. 65 at 7-8; Dkt. 72 at 4.

The claimed invention rejects this approach, asserting it "imposes significant performance overhead." '814 patent at 1:56-62. Instead, the claimed invention "utilizes a kernel resident on the server that is part of the OS [] to execute its application." 4:60-67; *see also* Br. 2-3 (quoting same). Thus, "any system calls made by application libraries (or embedded in application executables themselves) ***must be compatible with the underlying kernel*** on the platform." 10:64-67; *see also* cl. 17 (reciting "first software application including ***an object executable by a local operating***

***system of the incompatible computer platform***"); '814 cl. 1 (requiring that "the set of associated system files" used by the application "are compatible with a local kernel of at least some of the plurality of different operating systems"). Moreover, that an application will run on a platform does not mean it will run ***well***. The specification provides the example of the Solaris 8 version of the "ls" application[1] on Solaris 10. 11:16-36; *see also* Br. 6-7 (quoting same). To avoid unexpected behavior, the claimed invention uses "the Solaris 8 version of libc," upon which the ls application relies, "instead of the incompatible Solaris 10 library." 11:32-34. This is intended to ensure that the behavior of the Solaris 8 version of "ls" remains the same when running on Solaris 10. But the Solaris 8 version of "ls" must be compatible with the Solaris 10 kernel, else it could not run at all, regardless of the libraries it attempts to use after it begins running. The claim language (below) similarly reflects the specification's requirement that the application be provided and then be able to be executed on the nevertheless incompatible computer platform.

> a) providing a computer readable set of first files, comprising a first group of files that include the first software application, designed to execute on the first computer platform and a second group of files that are distributed with or are specific to an operating system required to execute the first software application;
>
> b) in the execution of the first software application on the incompatible computer platform using said second group of files in place of the associated local system files normally used to perform a same task, which are resident on the incompatible computer platform as part of the operating system, and,

Given this intrinsic evidence, incompatibility must mean something other than that the application cannot run at all on the computer platform. In other words, the "incompatible computer platform" must be "incompatible" in another way than the application simply not working at all. So that then begs the question–what else provides the objective boundaries of the requisite "incompatibility" of the computer system? Indeed, as VirtaMove concedes, there are many "form[s] of incompatibility." Br. 8. An application may run but crash at fixed or random times, it may lack some but not all of its functionality, etc. Nor is it the case that applications that execute on one platform are necessarily incompatible with other platforms, as VirtaMove seems to suggest: "Using system service filters there are two capabilities that are essential to enabling a software application intended to execute on one platform (hardware, OS and kernel) to execute on a ***different, potentially***

[1] ls "lists directory contents" (11:16), and is similar to displaying the list of files within a folder on Windows or Mac.

***incompatible platform***."[2] 9:42-45. The claims do not provide the objective boundaries as to which form(s) of incompatibility are encompassed by the claimed invention (or not). This renders the scope of the term indefinite. *Nautilus*, 572 U.S. at 910.

VirtaMove asserts Google cannot show indefiniteness because it has not submitted expert testimony, asserting that is "fatal" to any such assertion. Br. 4. This is a misrepresentation of black letter law. There is no such requirement. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) (finding it "unnecessary to rely on [expert] testimony (or any other extrinsic evidence)" to determine a phrase is indefinite). *Williamson v. Google Inc.*, No. 15-CV-00966-BLF, 2017 WL 3232582, at *10 (N.D. Cal. July 27, 2017), cited by VirtaMove, merely lists expert testimony as an "example" of evidence that may show indefiniteness. As VirtaMove acknowledges in the same paragraph, the intrinsic evidence is more significant than any such extrinsic evidence. *Phillips*, 415 F.3d at 1317. VirtaMove also argues *Barrette Outdoor Living, Inc. v. Fortress Iron, LP*, 156 F.4th 1353, 1367 (Fed. Cir. 2025) holds that providing examples of structures ***alone*** is sufficient for definiteness. Br. 4. That is untrue. In actuality, *Barrette* found that "the surrounding claim language provides guidance as to the scope of the 'sliding' terms" and that "the specification provides guidance as to the scope of the 'sliding' terms," then pointed to two Figures applying that guidance before concluding the terms were not indefinite. *Barrette*, 156 F.4th 1353 at 1366-67. No such corollary exists here.

**B. VirtaMove's Efforts to Rehabilitate "Incompatible Computer Platform" Fail.**

As discussed in Section I.A *supra*, both the claims and specification require that the "first software application" is already able to execute on the platform, without any change to the application itself.[3] VirtaMove's interpretation of the term as requiring that the platform cannot run the application without first changing the application (Br. 5) is accordingly nonsensical and contradicts explicit claim language. 17:29-31 ("said first software application including an object executable by a local operating system of the incompatible computer platform"). If "incompatible

---

[2] And such an interpretation would read "incompatible" out of the claim language. *Wasica*, 853 F.3d at 1288.

[3] The separate "in place of" and "filtering" limitations in steps 17[b] and 17[c] do not change the "first software application" either.

computer platform" were really interpreted in this manner, then "[t]he self-contradictory language of the limitation renders the claims indefinite." *WSOU Invs. LLC v. Google LLC*, No. 2022-1066, 2023 WL 6210607, at *7 (Fed. Cir. Sept. 25, 2023); *see also In re Shafovaloff*, No. 2024-1035, 2025 WL 1779173, at *1 (Fed. Cir. June 27, 2025) ("Contradictory limitations within a single claim or between different claims can render a claim indefinite."); *Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1366–67 (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite.").

Moreover, VirtaMove's "binary incompatibility" interpretation is not a position that VirtaMove ever set forth in the parties' meet and confer discussions. Nor does VirtaMove's construction mention the word "binary," much less tether it to "binary" in any way. Rather, VirtaMove's construction simply asserts the "application cannot run without change." It does specify ***what*** "change" it is referring to, to an application binary or otherwise. This not only opens the door for some different interpretation down the road, but reflects the indefiniteness of the phrase at issue and even VirtaMove's proposed construction. Br. 5-6.

In any event, it is basic computer science that an application binary is the 1s and 0s executed by the computer to make an application run, *e.g.* the application binary for the Windows version of Microsoft Word is typically contained in the file "WINWORD.EXE." *Newton's Telecom Dictionary* ("**Binary File** A file containing information that is in machine-readable form. It's an application. Or it can be read by an application."); *see also id.* at "Binary" (explaining binary notation). Thus, under VirtaMove's proposed interpretation of its construction, the 1s and 0s of the "first software application" itself ***must*** be changed in order to work with the incompatible operating system. *E.g.*, Br. 5 ("an application and computer platform are *binary compatible* if and only if the application can 'run without change' (i.e., without a modification to the application *binary*) in the different computer platform") (emphasis original). But the intrinsic evidence in no way suggests that applications' "binary" must be changed. Rather, again as stated above, the intrinsic evidence shows the application itself does ***not*** change.

At a minimum, to the extent the Court finds the claims are not indefinite due to "incompatible" meaning "binary incompatible" as VirtaMove argues, it should include that in the construction, which VirtaMove's proposal does not. Br. 9; *Wasica*, 853 F.3d at 1288.

**C. "Not Intended to Execute" Is Also Indefinite**

The term separately requires that the application "is not intended to execute" on the incompatible computer platform. "Intent" is, by definition, subjective. *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018). VirtaMove seemingly agrees as it points to a dictionary definition of "intend" as "design or destine (someone or something) for a particular purpose or end." Br. 9. This merely proves Google's point, as it involves ascertaining a "purpose or end" of someone's design.

But even more, the claims do not specify the identity of the person or persons whose "intent" is to be evaluated. It may be some or all of the programmers for a given application, their manager, the company, some combination of the above, or something else. If multiple entities are involved, it is further unspecified what number or percentage are needed to find the requisite intent met. *E.g.*, if one programmer of the Solaris 8 "ls" application intended it to run on Solaris 10 while the other did not, is the claim met? "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, 572 U.S. at 909 (quotation omitted). By drafting the '762 claims with "intended" language, the applicants failed to provide the necessary precision.

As a supposed resolution of this indefiniteness, VirtaMove asserts that "intended" means "designed." Br. 8. Initially, even if "intended" meant "designed" the claims would still be indefinite for failing to specify *whose* "design" should be considered.

Regardless, VirtaMove points to nothing in the intrinsic evidence that supports that "intended" means "designed." VirtaMove oddly argues the use of both "intended" and "designed" in unasserted claim 16 somehow supports these two different terms meaning the same thing. But "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *see also Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) (finding same). So the fact

that "intended" and "designed" are used in claim 16 (and claim 17) shows that they are presumed ***not*** to mean the same thing.

And in fact claim 16, and asserted claim 17, use "design" and "intended" differently. They use "***designed*** for execution" to refer to the "first computer platform" and "not ***intended*** to execute" when referring to another, "incompatible computer platform." Using the example software from the specification (11:16-36), a programmer who *designed* an application for Solaris 8 may have also *intended* the application to function (at whatever indefinite level) on Solaris 10.

VirtaMove also seeks to avoid indefiniteness by arguing that "design" in "first software application is not designed to execute" refers to the design of "the objective properties of the application." Specifically, VirtaMove states "The [Solaris 8 ls] application was designed to use [Solaris 8 libc] files, which are not present in Solaris 10; thus, the [Solaris 8 ls] application was not designed to execute in Solaris 10." Br. 8 But this makes no sense. At the time the Solaris 8 ls application was written, Solaris 10 did not exist, and thus the contents of its libc files was unknown. So it is not possible for Solaris 8 ls to have been "designed," or not "designed," for a platform that did not exist and, at that point, may never exist. This is precisely the problem Google articulated at the meet and confer in explaining that a PlayStation 4 game written in 2015 cannot be "designed for" a PlayStation 5 console that was not released until 2020. Br. 9-10. VirtaMove's only response, which it did not offer at the meet and confer, is that the "intended" language "does not come into play" in that instance. Br. 10. But the claims are drafted as requiring two independent limitations: "incompatible computer platform" and "not intended to execute." They must always "come into play" as a matter of law. *Wasica*, 853 F.3d at 1288.

*Williamson v. Google Inc.*, No. 15-CV-00966-BLF, 2017 WL 3232582, at *11 (N.D. Cal. July 27, 2017), cited by VirtaMove as somehow supporting that "intend" refers to objective design, is inapposite. *Williamson* did not involve claims that also separately recite "designed." And as VirtaMove's quote notes, *Williamson* hinged on "the specification and the prosecution history" of that patent. Br. 9 (quoting *Williamson*, 2017 WL 3232582 at *11).

## II. Lack of antecedent basis terms: the second incompatible computer platform / the local operating system libraries (’762 cl. 17)

| | | |
|---|---|---|
| **The second incompatible computer platform** | **Google**: Indefinite | **VM**: the incompatible computer platform |
| **The local operating system libraries** | **Google**: Indefinite | **VM**: No construction necessary; plain and ordinary meaning |

It is black letter law that “the definite article ‘the’ particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of ‘a’ or ‘an’.” *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) (internal quotation omitted). And in a patent claim, use of “the” preceding a claim element is interpreted to refer to an earlier recitation of the same claim element. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356–57 (Fed. Cir. 1999). But here there is no dispute that both “the second incompatible computer platform” and “the local operating system libraries” recited in ’762 claim 17 lack such a preceding claim element. Br. 10, 12. That is, there is no prior recitation of a claim element to which either term refers. Nor would a person of skill in the art be able to determine, with reasonable certainty, what that referenced term would be, rendering both terms indefinite. *Nautilus*, 572 U.S. at 901; *see also Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526–27 (Fed. Cir. 2020) (finding a claim reciting “said different IP Address” invalid because a person of skill in the art “could not, with reasonable certainty, discern the meaning of the claim term”); *eCardless Bancorp, Ltd. v. PayPal Inc.*, No. 24-CV-01054-BLF, 2024 WL 4804975, at *13–14 (N.D. Cal. Nov. 14, 2024) (finding claims reciting “said transaction identification” indefinite for lack of antecedent basis, and further collecting cases).

None of VirtaMove’s attempts to remedy this issue hold merit, but indeed simply reinforce the indefiniteness caused by the lack of antecedent basis.

### A. The second incompatible computer platform

To avoid the undisputed lack of antecedent basis for this term, VirtaMove proposes that “the second incompatible computer platform” be construed as “the incompatible computer

platform." In other words, VirtaMove seeks to strike "second" from the claim language altogether. But again, "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Wasica*, 853 F.3d at 1288.

While not acknowledging it, what VirtaMove is really asking the Court to do is *correct* the claim language without even attempting to meet the high standard to do so. A district court can only correct claim language if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003); *Fargo Elecs., Inc. v. Iris, Ltd., Inc.*, 287 F. App'x 96, 100 (Fed. Cir. 2008) (following *Novo Indus.* post-*Phillips*). VirtaMove cannot and does not meet this standard.

Specifically, while "the second incompatible computer program" ***could*** refer to "the incompatible computer program" recited earlier in the claim, it could also be read as "***a*** second incompatible computer platform." That is, the claim could recite an "incompatible computer platform" that uses the "in place of" solution recited in step 17[b], and a "second incompatible computer platform" that uses the "filtering" solution recited in step 17[c]. Indeed, nothing in the specification asserts or even suggests that those two steps must be used on the same computer platform as VirtaMove's proposed "correction" to the claim would require. Nor is there any reason the two steps need to be performed by the same platform because they are actually redundant of each other. If a "platform us[es] said second group of files in place of the associated local system files," then that platform need not also use the separate "filtering" step to "modify values that otherwise would have been returned by the local operating system." And if the "associated local system files" were not called in step 17[b], there are no "values that otherwise would have been returned by the local operating system" to modify. Since the interpretations are subject to reasonable debate, the claim language cannot be corrected by the Court. *Bushnell Hawthorne*, 813 F. App'x at 526.

The language VirtaMove points in the preamble (Br. 10-11) does not show otherwise. VirtaMove contends that because the preamble recites "the incompatible computer platform" includes a processor and an operating system, that can only refer to one incompatible platform. But

VirtaMove presents no reason why that language must also apply to the claimed "second incompatible computer program." Alternatively, a person of skill in the art could simply conclude that language applies to both the "incompatible computer platform" that performs the "in place of" step and the "second incompatible computer platform" that performs the "filtering" step. VirtaMove further asserts that, despite it being claimed, it does not make sense to run the runtime software that performs the filtering step on a "second" incompatible platform from where the application is being executed. Br. 11. Not so. The application may be executed at the "incompatible computer platform" that runs the runtime software and then *also* be executed on another, "second" platform using an alternate solution. VirtaMove does not explain why a person of skill in the art would think it necessary to perform both the "in place of" and the "filtering" steps on the same platform when both are not needed, and again the intrinsic evidence does not either.

Further, none of VirtaMove's cited cases on this point (Br. 10) involved claim language having multiple possible interpretations. *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) ("Neither the Commission nor the Intervenors argued that they did not understand the intended scope because of the absence of an antecedent."); *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) ("claim 1's recitation of one end user could only refer to the end user using the product"); *Lyft, Inc. v. Quartz Auto Techs. LLC*, Case No. 21-cv-01871-JST, 2022 WL 19975246, at *7–8.

**B. The local operating system libraries**

Claim 17[c] recites "the runtime software [] providing values from the at least one application filter library which is provided in addition to ***the local operating system libraries***." But here too, the claim recites "<u>the</u> local operating system libraries" without an antecedent basis for what "the" local operating system libraries are. And here too, there is no discernable solution to the ambiguity created, rendering it indefinite. *Nautilus*, 572 U.S. at 901.

This time, VirtaMove provides no construction. But it does assert that "the local operating system libraries" in claim 17[c] refers to libraries of the operating system of the 'incompatible computer platform." However, nowhere does the claim recite any "libraries" attributed to the "incompatible computer system" at all. Rather, here too, there are two possibilities as to what the

"the local operating system libraries" could refer. Though not stated or claimed, it could be the case, as VirtaMove notes, that these are libraries of the "incompatible operating system." Alternately, the libraries could be part of the set of files provided by step 17[a], in accordance with step 17[c]'s requirement that "the at least one application filter library [be] ***provided in addition to the local operating system libraries***," as claim 17 does not recite any other provided files. So here too, because the interpretation is subject to reasonable debate, the claim language cannot be corrected by the Court. *Bushnell Hawthorne,* 813 F. App'x at 526.

## III. Processor ('762 cl. 17)

| | |
|---|---|
| **Google**: physical computer processor | **VM**: No construction necessary; plain and ordinary meaning |

Claim 17 requires that "the incompatible computer platform include[e] a processor." The parties dispute whether a "processor" is a physical, hardware processor consistent with the common use of "processor" (e.g. a computer processing unit (CPU)) and the intrinsic evidence distinguishing virtual processors (Google), or some unstated plain and ordinary meaning that encompasses virtual processors (VirtaMove). This dispute requires resolution, not an unstated plain and ordinary meaning construction. *O2 Micro*, 521 F.3d at 1361.

Outside of the claims and the portion of the specification that largely mimics the claim language (2:3-18, 3:34-46), the '762 patent does not use the term "processor." But the '814 and '058 patents incorporated by the '762 patent (1:18-24) both explicitly refer to a "processor" as physical hardware. '814 patent at 6:60-63 ("Each server includes a processor and an independent operating system. Each operating system includes a kernel 12, ***hardware 13 in the form of a processor*** and a set of associated system files, not shown."); '058 patent at 7:10-12 ("The application stops running as ***the hardware*** 18 enters kernel mode. ***The processor*** makes the transition to a protected/privileged mode of execution called kernel mode."). This is consistent with the common meaning of "processor" in the context of computer systems. *American Heritage Dictionary* ("*processor*: 2. *Computer Science* b. A central processing unit"); *Barron's Dictionary* ("*CPU* (Central Processing Unit): the part of a computer where arithmetic and logical operations are performed and instructions are decoded and executed. The CPU controls the operation of the

computer."); *New Webster's Dictionary* ("*processor* (*computer*): *CENTRAL PROCESSING UNIT"; "*central processing unit* (*computer*) the device in a computer that contains logic, arithmetic, and control circuits, and sometimes input and memory units, *abbr* CPU."); *Oxford Computer Dictionary* ("*processor*: A computer, usually/often the central processor"). So while VirtaMove asserts that "Google does not contend that the 'plain and ordinary meaning' of 'processor' is a 'physical computer processor'" (Br. 13), this is incorrect. Google's construction ***is*** the plain and ordinary meaning of "processor" in light of the claims and specification as detailed above. VirtaMove's reference to "disclaimer" (Br. 13-14) is thus similarly inapposite.

Notably, VirtaMove ***agreed*** that "processor" means "physical computer processor" with respect to the '814 patent. Dkt. 165 at 3. "[U]nless otherwise compelled," courts presume "that the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); *see also Carnegie Mellon Univ. v. LSI Corp.*, No. 18-CV-04571-JD, 2025 WL 2323347, at *5 (N.D. Cal. Aug. 12, 2025) (quoting same). But VirtaMove provides no legitimate basis to depart from its prior agreement that compels such a deviation. Nor could it as, again, the '762 patent incorporates the '814 patent specification, and the '762 patent does not further substantively address or discuss the "processor" term such that no other intrinsic evidence exists to compel a different conclusion. And it would be confusing to jurors to apply different constructions of "processor" to different claims of these integrally related patents asserted against the same products in the same case.

While not part of any articulated construction, it appears VirtaMove opposes Google's construction because it wishes to urge at trial that a "processor" encompasses *virtual* processors or "vCPUs." Br. 13. But the incorporated '814 patent specification states "virtual machines," which use virtual processors[4], take a "different" approach that imposes "significant performance overhead." '814 patent at 1:51-2:3. The applicants thus intended the claimed invention to be an alternative to virtual machine technology, not used with that technology, and drafted their claims accordingly. The Court should reject VirtaMove's efforts to expand the scope of the claims beyond

[4] *Microsoft Computer Dictionary* ("**virtual machine** *n*. Software that mimics the performance of a hardware device, such as a program that allows applications written for an Intel processor to be run on a Motorola chip")

what the applicants intended. *Phillips*, 415 F.3d at 1316 ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.") (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998)).

Rather than focus on the intrinsic evidence, VirtaMove points to other specifications of unrelated patents. Br. 13-14. That extrinsic evidence from unrelated patents may redefine "processor" to include virtual processors within those unrelated patents, however, does not negate the explicit disclosures in the intrinsic evidence of the '762 patent discussed above. *Phillips*, 415 F.3d at 1317 (extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language"); *Netflix, Inc. v. Rovi Corp.*, No. 11-CV-6591-PJH, 2015 WL 4345326, at *2 (N.D. Cal. July 15, 2015), *aff'd*, 670 F. App'x 704 (Fed. Cir. 2016) ("In most cases, claims can be resolved based on intrinsic evidence. Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language may the court then rely on extrinsic evidence.") (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir. 1996)).

## IV. Normally used to perform the same task ('762 cl. 17)

| | |
|---|---|
| **Google's Revised Construction**: that would be used if the corresponding files were not present in said second group of files | **VM**: No construction necessary; plain and ordinary meaning. Alternatively: "that would be used to perform a same task if the second group of files were not used to perform the same task |

Claim 17 requires "using said second group of files [that are provided in the prior step] in place of the associated local system files ***normally* used to perform the same task**, which are resident on the incompatible computer platform as part of the operating system." VirtaMove complains about the word "capsule" (Br. 16) in Google's construction. VirtaMove did not raise this issue during the parties' meet and confers, but Google has revised its construction to address it by replacing "capsule" with "in said second group of files." But the parties still dispute what the term at issue means.[5] Consistent with the intrinsic evidence, Google's construction provides that files "normally used to perform the same task" are superseded by a corresponding file in the "second

[5] Google informed VirtaMove of its revised constructions prior to filing this brief, but VirtaMove did not indicate that it agreed with those constructions.

group of files" that Claim 17 says are used in place of those "normally" used. VirtaMove contends that the file "normally used to perform the same task" may actually be used, even if a corresponding file in the "second group of files" is present.

Google's proposal comports with the plain meaning of the claim language, the specification, and common sense. As discussed *supra*, the claimed invention provides files relied upon by the application, then uses those provided system files in place of the local system files. '814 patent at 7:1-3. This functionality is recited in the '762 claim 17[b]:

> b) in the execution of the first software application on the incompatible computer platform ***using said second group of files in place of the associated local system files normally used to perform a same task***, which are resident on the incompatible computer platform as part of the operating system

Google's proposal comports with the claim language: the "second group of files" are used "in place of the associated local system files normally used to perform a same task." Indeed, this language must mean that the "second group of files" are used "in place of the associated local system files normally used to perform a same task" for it to make any sense. Consistent with the claim language, the specification never suggests that the "second group of files" provided with the application need not be used. It would make little sense to do so, since the "second group of files" contains the system files the application expects, as opposed to the system files already on the platform which may or may not have the expected functionality. Nor would it make sense to include files in the provided "second group of files" that the claimed method does not use.

In addition to not making any sense, VirtaMove's position would render the claims invalid. The specification does not include any mechanism by which the claimed invention could determine when to use the version of a file in the "associated local system files" on the platform instead of the version in the "second group of files." Construing the claims as VirtaMove suggests would thus render them invalid for lack of written description, and potentially for lack of enablement as well. *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity.") (*quoting Phillips*, 415 F.3d at 1327).

The parties identified the dispute between their proposals on the meet and confer:

> 5. *[associated system files] normally used to perform same task* -- VirtaMove proposed "that would be used to perform a same task if the second group of files were not used to perform the same task", and explained its construction is meant to capture that the associated system files could be used even if the capsule files are present. **Google disagrees**. The parties are at an impasse for this term.

Ex. H (6/18/2026 Email). Yet VirtaMove does not address that dispute at all (Br. 15-16), and should not be permitted to do so in its Reply, when Google has no opportunity to respond in writing.

## V. Runtime software ('762 cl. 17)

| | |
|---|---|
| **Google**: engine that provides services to managed software | **VM**: No construction necessary. |

The parties dispute whether "runtime" should have its common meaning (Google), or whether it should be written out of the claims altogether (VirtaMove).

The relevant language appears in claim 17[c] which provides below:

> c) executing on the second incompatible computer platform runtime software for managing a dynamic state and file location of the first software application, the runtime software including a kernel module resident in kernel mode and at least one application filter library resident in user mode and filtering one or more system service requests made by the first software application and providing values from the at least one application filter library which is provided in addition to the local operating system libraries to modify values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application, and executing the first software application by accessing files from first set of files in place of operating system files and wherein predetermined values are provided instead of values related to an identity of the incompatible computer platform.

Thus, the claims require that the "runtime software," not just any "software", execute several tasks: [1] "manag[e] a dynamic state and file location of the first software application", [2] "includ[e] a kernel module [] and at least one application filter library, [3] "filter[] one or more system service requests," and [4] "execut[e] the first software application." But the claim is explicit that not just any "software" performs these steps–"runtime software" does so. *See also* 6:14-26, 8:17-34, 8:62-9:17, 12:33-41 (specification describing various functions performed by the runtime software); *see also* Br. 17-18.

While it uses the term repeatedly, the intrinsic evidence does not set forth any definition or suggest any specific meaning of "runtime software." In this context, it is appropriate to reference extrinsic evidence, including dictionaries. *Phillips*, 415 F.3d at 1317-18 ("Because dictionaries, and

especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention."). And here, the only technical dictionary offered by the parties explains that "runtime" refers to "common language runtime," which in turn means "The engine at the core of managed code execution. The runtime supplies managed code with services such as cross-language integration, code access security, object lifetime management, and debugging and profiling support." *Microsoft Computer Dictionary*. Google's construction streamlines the definition and is consistent with the operations performed by the runtime software in claim 17, such as "managing a dynamic state and file location of the first software application" and "filtering one or more system service requests." It is also consistent with the functions performed by the runtime software in the specification. 6:14-26, 8:17-34, 8:62-9:17, 12:33-41.

VirtaMove again provides no construction. The closest it comes to indicating what it thinks "runtime software" is is a statement that can be interpreted as "software that 'manage[s] dynamic application state." Br. 17. But as discussed *supra*, the claim already requires that the runtime software "manag[e] a dynamic state and file location of the first software application," among other things. VirtaMove's apparent interpretation is thus that "runtime" does not mean anything at all, such that the limitation would mean the same thing were "runtime software" replaced with just "software." But again, "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Wasica*, 853 F.3d at 1288; *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). VirtaMove's evidence (Br. 17-18) merely describes functions that the runtime software performs. It does not indicate that "runtime software" simply means "software."

## VI. Modify [values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application] ('762 cl. 17)

| | |
|---|---|
| **Google's Revised Construction**: make changes to [values that otherwise would have been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application] | **VM**: No construction necessary; plain and ordinary meaning. |

VirtaMove's brief addresses only whether a modification can be a "partial or minor" change. Br. 19. To narrow the issues, Google has removed that portion of its proposed construction because, while accurate, it does not appear relevant to the crux of the dispute. The dispute instead is that even though it proposes no construction, VirtaMove appears to interpret this term as not requiring a modification, i.e. "change," in the values at all. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362.

This term appears in in claim 17[c] which recites:

> c) executing on the second incompatible computer platform runtime software for managing a dynamic state and file location of the first software application, **the runtime software** including a kernel module resident in kernel mode and at least one application filter library resident in user mode and **filtering one or more system service requests** made by the first software application and **providing values from the at least one application filter library** which is provided in addition to the local operating system libraries ***to <u>modify</u> values that otherwise would have been returned by the local operating system in the absence of said filtering*** one or more system service requests from the first software application…

The plain language of the claim thus requires first obtaining "values that otherwise would have been returned by the local operating system," then "modifying" them using "the at least one application filter library." So if "values from the at least one application filter library" are not modified from "values that otherwise would have been returned by the local operating system," the method has not met the "modifying" limitation because no values were "changed." For example, if the method returns a new IP address without first obtaining, and then ***changing***, another IP address, it has not met the "modify" language because nothing has "changed" at all. This accords with the plain meaning of "modify" as "make partial or minor changes to (something), typically so as to improve it or make it less extreme." *Oxford Dictionary*; *see also* Br. 19-20 (citing an online

dictionary definition of "modify" as requiring "basic or fundamental changes"). It also accords with the specification, which explains that "The system service filter for uname would ***modify the value returned for system name from that defined by the OS to a capsule specific value***." 10:5-17. It further distinguishes step 17[c] from 17[b], which instead "us[es] said second group of files in place of the associated local system files normally used to perform a same task," and therefore does not obtain any values from "the associated local system files" to modify.

Google's showing that a change is required is unrebutted, as VirtaMove avoids addressing this issue at all. This alone shows Google's construction should be adopted.

Further, it is clear there is a dispute and that VirtaMove intends to argue that modifying values that otherwise would have been returned by the local operating system does not require any "change" at all. As to this limitation, VirtaMove points to values that are merely provided without pointing to any "change" at all. *E.g.*, '762 Infringement Chart (Ex. I) at 32 (asserting that obtaining the hostname of the container alone, without first obtaining another hostname that is changed into the hostname of the container, meets the "modifying" limitation)." *O2 Micro*, 521 F.3d at 1362.

## VII. Process context ('762 cl. 18)

| | |
|---|---|
| **Google's Revised Construction**: the running state of the runtime software, including its address space | **VM**: No construction necessary; plain and ordinary meaning |

Dependent claim 18 requires that "the one application filter library resident in user mode for filtering one or more system service requests is executed in a same process context as a process which requests a service." Similar to the operating system, kernel, and service terms referenced in Section VIII *infra*, the parties dispute whether the technical language should be construed in a manner the jury will understand (Google), or to have no construction at all so that VirtaMove can assert some unknown meaning down the road that departs from its proper, technical meaning.

Google's construction is adapted from an online article describing "Processes on Linux and Windows NT" explaining that

> The context of a process includes its address space, stack space, virtual address space, register set image (e.g. Program Counter (PC), Stack Pointer (SP), Instruction Register (IR), Program Status Word (PSW) and other general processor registers),

> updating profiling or accounting information, making a snapshot image of its associated kernel data structures and updating the current state of the process (waiting, ready, etc).

*The Linux Gazette*, Issue 23 (Dec. 1997), "Process Context" (Ex. J). At the parties' meet and confer, Google explained that it was seeking to define a technical term for the benefit of a lay jury, and would consider other definitions that VirtaMove proposed. VirtaMove did not provide any. Nor did VirtaMove explain what it found objectionable about Google's proposal. Now that VirtaMove has belatedly done so in its opening brief in arguing that "[a] program is not a claim term and has no obvious referent" (Br. 20), Google has revised its construction to replace "a program" with "the runtime software" referenced in the claim in an effort to narrow the issues.

VirtaMove spends four pages arguing that "process context" should be construed according to its "plain and ordinary meaning," but never explains what that meaning is. Br. 20-23. The closest VirtaMove comes to an explanation is to move the words of the term around: "the patentee used 'process context' in its plain and ordinary sense, indicating the context of an individual process." Br. 21. But this is of no help to a lay juror, who has likely never heard of a "process" or "context" in reference to computer systems.

As with the terms listed *infra*, VirtaMove's refusal to provide the supposed "plain and ordinary meaning" of technical terms for a lay jury, and its accompanying refusal to engage with Google to find a definition upon which the parties can agree (*c.f.* "address space", Dkt. 165 at 4) or at least crystalize a dispute for the Court, suggests that VirtaMove intends to present a claim interpretation to the jury that does ***not*** comport with the actual plain and ordinary meaning of these technical terms. Such evasions cannot stand. *O2 Micro*, 521 F.3d at 1361. The Court should enter Google's proposed construction.

## VIII. Overlapping Claim Terms with ’814 patent: Operating System / Kernel / Service (’762 cl. 17)

| | | |
|---|---|---|
| **Operating System** | **Google**: a computer platform in which the first software application cannot run without change and in which the first software application is not designed to execute | **VM**: No construction necessary; plain and ordinary meaning |
| **Kernel** | **Google**: the core of an operating system—the portion of the system that manages memory, files, and peripheral devices; maintains the time and date; launches applications; and allocates system resources | **VM**: No construction necessary; plain and ordinary meaning |
| **Service** | **Google**: specialized, software-based functionality provided by network servers and comprised of one or more applications | **VM**: No construction necessary; plain and ordinary meaning |

While VirtaMove includes briefing for these terms (Br. 24-25), the parties had previously agreed that they would refer to prior briefing as to the ’814 patent regarding overlapping terms that are also in dispute for the ’762 patent. Consistent with the parties’ agreement, Google accordingly incorporates its previously filed briefing for these terms with respect to the ’814 patent. Dkt. 63 at 4-5, 7-8; Dkt. 66 at 1-3. If the Court prefers Google refile these positions in some manner, Google is happy to do so.

Dated: August 21, 2026

*/s/ Antonio Sistos*

David A. Perlson (CA SBN 209502)
david.perlson@hlc.com
Antonio Sistos (CA SBN 238847)
ton.sistos@hlc.com
Yiming Gu (CA SBN 364089)
yiming.gu@hlc.com
**HOGAN LOVELLS CADWALADER US LLP**
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499

*Counsel for Defendant Google LLC*

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that, on August 21, 2026, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to counsel for all parties of record.

*Antonio Sistos* (signed /s/)