RUSS, AUGUST & KABAT

Marc Fenster (SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
rmirzaie@raklaw.com
Neil A. Rubin (SBN 250761)
nrubin@raklaw.com
Jacob Buczko (SBN 269408)
jbuczko@raklaw.com
Ali-Reza Boloori (SBN 271489)
aboloori@raklaw.com
James A. Milkey (SBN 281283)
jmilkey@raklaw.com
James Tsuei (SBN 285530)
jtsuei@raklaw.com
Christian Conkle (SBN 306374)
cconkle@raklaw.com
Qi (Peter) Tong (SBN 300347)
ptong@raklaw.com
Jonathan Ma (SBN 312773)
jma@raklaw.com
Daniel Kolko (SBN 341680)
dkolko@raklaw.com
Mackenzie Paladino (*pro hac vice*)
mpaladino@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-9226

*Attorneys for Plaintiff,*
*VirtaMove Corp.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| VIRTAMOVE, CORP.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC<br><br>Defendant. | Case No. 25-CV-00860-NW (lead)<br>Case No. 26-CV-00704-NW (member)<br><br>Honorable Noël Wise<br><br>**PLAINTIFF VIRTAMOVE CORP.'S REPLY CLAIM CONSTRUCTION BRIEF REGARDING '762 PATENT**<br><br>Jury Trial Demanded |

**TABLE OF CONTENTS**


1. "incompatible computer platform. . ." ....... 1
2. "the second incompatible computer platform" ....... 6
3. "the local operating system libraries" ....... 7
4. "processor" ....... 8
5. "normally used to perform a same task" ....... 11
6. "runtime software" ....... 13
7. "Modify" ....... 13
8. "process context" (Claim 18) ....... 15


RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

## TABLE OF AUTHORITIES

**Cases**

*Carnegie Mellon Univ. v. LSI Corp.*,
No. 18-cv-04571, 2025 WL 2323347 (N.D. Cal. Aug. 12, 2025) .......... 9

*Finjan LLC v. ESET, LLC*,
51 F.4th 1377 (Fed. Cir. 2022) .......... 8, 9

*GPNE Corp. v. Apple Inc.*,
830 F.3d 1365 (Fed. Cir. 2016) .......... 11

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018) .......... 4

*Invensas Corp. v. Renesas Elecs. Corp.*,
No. CV 11-448-GMS, 2013 WL 3753621 (D. Del. July 15, 2013) .......... 5

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) .......... 5

*Lyft, Inc. v. Quartz Auto Techs. LLC*,
Case No. 21-cv-01871-JST, 2022 WL 19975246 (N.D. Cal. Nov. 3, 2022) .......... 6

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
959 F.3d 1091 (Fed. Cir. 2020) .......... 13

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*,
520 F.3d 1367 (Fed. Cir. 2008) .......... 1

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .......... 11

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 9

*Transclean Corp. v. Bridgewood Servs., Inc.*,
290 F.3d 1364 (Fed. Cir. 2002) .......... 10

*Twist, Inc. v. B GSE Grp., LLC*,
No. 3:19-cv-00583-MOC-DSC, 2021 WL 2210892 (W.D.N.C. June 1, 2021) .......... 2

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) .......... 13

*Williamson v. Google Inc.*,
No. 15-CV-00966-BLF, 2017 WL 3232582 (N.D. Cal. July 27, 2017) .......... 3

**1. "incompatible computer platform. . ."**

Google presents three logically unsound indefiniteness theories.

**a. Google conflates *kernel* incompatibility with *computer platform* incompatibility.**

Google argues that the claim is "nonsensical" because it requires the first software application to be *compatible*, not incompatible, with a specific portion (the "kernel") of the incompatible computer platform. *See* Response Brief, Dkt. 191 ("Resp."), at 7. Not so. Google's assumption that "incompatible computer platform" means "incompatible kernel" is nonsensical. An "apparent nonsensical reading" merely shows "the ease of determining the appropriate meaning" of the claim terms in context, *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008), because a nonsensical reading is likely a wrong reading.

Google errs by conflating kernel (in)compatibility with computer-platform (in)compatibility. The parties have agreed that "computer platform" means "a computer system with a single instance of a fully functional operating system installed." Dkt. 165 at 3. The claim itself requires that the incompatible computer platform include "an operating system," which includes "a local kernel… and a set of associated local system files." The parties also agree that the claim requires ***kernel*** compatibility between the incompatible computer platform and the first software application. *See* Opening Brief, Dkt. 185 ("Br."), at 7-8; Resp. at 5-6. Google does not dispute that this form of compatibility was conventional and widespread (*see* Br. at 7-8).

But the fact that certain files in an application are compatible with a ***portion*** of the computer platform (the kernel) does not imply that the application is compatible with the computer platform as a whole. As VirtaMove explained and Google again does not dispute, the patent solves the separate problem of incompatibility between an application and aspects of a computing platform other than the operating system ***kernel***, with the specification providing detailed examples of incompatible ***system files***. Br. at 6-9. Indeed, the claim itself solves the problem of incompatible system files, e.g. by providing "a second group of files that are distributed with or are specific to an operating system required to execute the first software application" and "using said second group of files in place of the associated local system files."



RUSS, AUGUST & KABAT

The claim is explicit that the first software application is compatible with the incompatible computer platform as to the ***kernel***, even while requiring incompatibility as to the platform as a whole (e.g., due to system file incompatibility), and that is the sense in which "incompatible computer platform" is used in the claims.[1] Determining that something is an "incompatible computer platform" does not require, as Google seems to suggest, determining that the platform be incompatible *in every conceivable aspect*. That approach would lead to genuine nonsense, and would imply, e.g., that a computer platform whose processor is incapable of running an application (such that the application literally could not run under any circumstances), nevertheless fails to meet the "incompatible" limitation so long as it happens to use the same type of memory storage, or the same binary digits, as the application's intended platform.

Google speculates about whether an application "will run ***well***," would exhibit "unexpected behavior," might "run but crash at fixed or random times" or "lack some but not all of its functionality." Resp. at 6 (emphasis Google's). This is not the incompatibility described in the patent, which relates to the first software application's technical dependency on "files that are distributed with or specific to an operating system required to execute the first software application." '762 Patent at 18:2-4; *see* Br. at 6-7 (explaining application's dependency on specific system files). Google is describing, instead, matters of efficiency, performance, or functionality. Under that interpretation, Adobe Acrobat is "incompatible" with major operating systems because it will "run but crash at fixed or random times"—plainly not what the claims contemplate.

There is also no evidentiary basis for Google's speculation: no support in the intrinsic record, no documentary evidence, and no expert testimony. Without evidence about the POSITA's understanding of claim scope, a mere litany of "a variety of hypothetical uncertainties [the patent challenger] believes a POSITA might face when determining" claim scope is "purely conjecture and attorney argument" and "is insufficient to prove indefiniteness." *Twist, Inc. v. B GSE Grp., LLC*, No. 3:19-cv-00583-MOC-DSC, 2021 WL 2210892, at *8 (W.D.N.C. June 1, 2021).

---

[1] A computer platform incompatible as to both kernel and system files would also be an "incompatible computer platform," as would a computer platform incompatible as to the processor. But those possibilities create no uncertainty about claim scope, because they are excluded by the limitation "object executable by a local operating system of the incompatible computer platform."

Google "cites" evidence designed to appear relevant to the hypothetical uncertainties: "[I]f the Solaris 8 version of an application were running on Solaris 10, then the corresponding functionality to print, save, go online, etc. may not operate as expected. ['762 Patent at] 11:16-21." Resp. at 2:3-5. Not so. The cited portion of the specification states:

> An example illustrating a Solaris 8 application that lists directory contents running on a Solaris 10 platform is provided. A Solaris 8 "ls" program uses the libraries libc.so.1 and libm.so.1 and requires the executables /usr/bin/ls and /usr/lib/ld.so. It will access the file /var/ld/ld.config during library initialization.

'762 Patent at 11:16-21. Neither this passage nor the rest of the specification supports Google's assertion, much less the idea that the claimed incompatibility is uncertain.

Google unsuccessfully took the same flawed approach in *Williamson v. Google Inc.*, where it argued a limitation was indefinite because there was a "limitless list of qualities one could consider to determine which server is 'best suited.'" *Williamson v. Google Inc.*, No. 15-CV-00966-BLF, 2017 WL 3232582, at *9 (N.D. Cal. July 27, 2017). Judge Freeman rejected this argument, looking to the specification's disclosures of exemplary criteria for a "best suited" server (like the disclosures of exemplary incompatible system files here) and the claim context (other limitations related to the suitability analysis, like the other incompatibility-related limitations here). *Id.* at *9-10. She correctly *rejected* Google's "conclusory assertions that [a POSITA] cannot discern the scope of the claim without specific selection criteria," unsupported by expert testimony. *Id.* at *10. This Court should likewise reject Google's imputations about running "well," crashing, et cetera.

**b. "Binary incompatibility" does not require that the claimed invention modify the application binary.**

Google suggests that VirtaMove's proposed construction or discussion of the prosecution history's use of "binary incompatibility" implies that the claim requires "changing the application," or that the software application "itself ***must*** be changed in order to work with the incompatible operating system." Resp. at 7-8 (emphasis Google's). Not so. As VirtaMove explained, an incompatible platform "cannot run the application without modification (***or without practicing the claimed invention***)." Br. at 6 (emphasis added). Google's argument conflates the "incompatible computer platform," which is only one element of the claimed invention, with the



RUSS, AUGUST & KABAT

invention as a whole. The fact that an application "cannot run without change" on the incompatible computer platform ***standing alone*** does not imply that the claimed method fails to accomplish its purpose of enabling the (unchanged) application to execute within the context of the recited "system" in which the claimed method is practiced. The core purpose of the invention, reflected in its title, is to "enable a software application to execute on an incompatible computer platform." '762 Patent, title. The claims enable that apparent impossibility by, among other things, "providing… a second group of files" in addition to the previously "incompatible" platform and "using" the second group of files in place of the incompatible platform's own files. Google's own summary of the patent concedes as much. *See* Resp. at 1-2.

The '762 Patent's recitation of doing what was previously "impossible"—running an application on a computer platform that the application cannot run on—is no basis of invalidity. Solving previously impossible problems is exactly what good patents do. A recent Google patent illustrates this plainly: U.S. Patent No. 12,158,805 claims a method that begins with the step of "detecting an uncorrectable error" and ends by "correcting… the uncorrectable error." Ex. 9. The invention teaches how to turn an uncorrectable error into a correctable one. The same is true here: the invention teaches specific steps that allow for previously impossible execution.

**c. "Not intended to execute" is objective.**

Google cites *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, for the proposition that "'[i]ntent' is, by definition, subjective." Resp. at 9:6 (citing 902 F.3d 1372, 1381 (Fed. Cir. 2018)). But that case had nothing whatsoever to do with intent as a claim limitation. *See IV I*, 902 F.3d at 1378-80. Instead, it addressed "optimize end user application IP QoS requirements," which the Federal Circuit held to be an indefinite term of degree. *Id.* at 1381. There is no suggestion here that "not intended to execute" is a term of degree.

Indeed, Google gives precisely *zero* evidence (much less clear and convincing evidence) that "not intended to execute" relates to the subjective intention of some unknown programmer. As VirtaMove explained, concluding its analysis of the intrinsic record, "not intended to execute" relates to "objective aspects of the design of the application itself, such as its dependency on operating system files associated with the first computer platform." Br. at 9. For example, in the

RUSS, AUGUST & KABAT

specification's example of a program "intended to execute" on Solaris 8, the program itself depends on Solaris 8 system files (such as libc), and does ***not*** depend on Solaris 10 system files. '762 Patent at 11:16-36 (noting that "the Solaris 8 version of libc" must be provided in order for the program to execute on Solaris 10). It is therefore not "intended to execute" on Solaris 10.

Google's response is that this "makes no sense," because "[a]t the time the ls application was written, Solaris 10 did not exist, and thus the contents of its libc files was unknown." Resp. at 10. Google's response, however, *assumes* that "not intended to execute" is subjective, even though as noted above the patent makes clear that there are *objective* boundaries for the term. And those properties of the program (and Solaris 10) are observable facts: if the program depends on files that Solaris 10 does not include, then the application is not "intended to execute" on Solaris 10, irrespective of when Solaris 10 was released.[2]

Google's "different claim terms are presumed to have different meanings" theory also fails. Resp. at 9-10. As VirtaMove pointed out (Br. at 8:19-26), Claim 16 uses the claim terms "intended" and "designed" ***interchangeably***. It recites "a first software application, which is ***designed*** for execution on a first computer platform," a phrase echoed in an anaphoric reference a few lines later: "the first software application ***intended*** to be executed on the first computer platform." '762 Patent at 16:65-66, 17:4-6. Google does not and cannot dispute that these two phrases refer to the same thing, which confirms that "designed" and "intended" are synonyms.

Furthermore, even if this limitation ***did*** involve an analysis of mental "intent" as Google contends, the Federal Circuit expressly *allows* claims involving "intentional purpose." *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003); *see also Invensas Corp. v. Renesas Elecs. Corp.*, No. CV 11-448-GMS, 2013 WL 3753621, at *2 n.10 (D. Del. July 15, 2013) (detailed discussion of why claims can properly include intent requirements).

---

[2] Google's reading ***also*** problematically changes "not intended to" to "intended ***not*** to." Assuming subjective intent ***were*** at issue, the claim would require a lack of intended compatibility (rather than affirmatively intended *incompatibility*); the programmer's inability to intend compatibility with a then-nonexistent operating system would *necessarily* mean the programmer did not intend the application to be compatible with that operating system under a subjective interpretation, such that there would be no ambiguity.

RUSS, AUGUST & KABAT

**2. "the second incompatible computer platform"**

As VirtaMove explained, *see* Br. at 10-12, a POSITA would understand with reasonable certainty that "the second incompatible computer platform" means "the incompatible computer platform." Google fails to provide clear-and-convincing evidence showing otherwise. Although Google attempts to resurrect "multiple possible interpretations" for the claim term, only the one identified by VirtaMove is reasonable. And the Court need not correct the claim, because the claim language ***as written*** has only one reasonable interpretation and requires no rewriting. *See Lyft, Inc. v. Quartz Auto Techs. LLC*, Case No. 21-cv-01871-JST, 2022 WL 19975246, at *7-8 (N.D. Cal. Nov. 3, 2022) (ruling lack of antecedent basis for a claim term did not render patent indefinite, without correcting the patent, because a POSITA "would reasonably understand the meaning").

Google does not dispute that VirtaMove's construction is a reasonable one. *See* Resp. at 12:11-12, 12:23-25. The dispute boils down to whether the other "possible interpretation" that Google advances (where element 17b recites one "incompatible computer platform" on which the "first software application executes," and element 17c recites a *different* "incompatible computer platform" on which "runtime software" executes) is also reasonable. *See id.* at 12:13-15. It is not.

Both the claim language and the specification contradict this interpretation and instead confirm that the only reasonable interpretation is that the "incompatible computer platform" on which the "first software application" executes in step b), and the "incompatible computer platform" on which the "runtime software" executes in step 17 c), are one and the same. Although the claim states that "runtime software" is executed on the "second incompatible computer platform," the claim also recites that the "second incompatible computer platform" is the same as the "incompatible computer platform" on which the "first software application" is executed: specifically, per step 17 c) the "application filter library" in the "runtime software" provides values that otherwise would have been returned by "the local operating system in the absence of [] filtering[.]" '762 Patent at 18:15-22. It does not make any sense for the "application filter library" to provide values that would be returned by an operating system residing on a different platform

than the platform on which the application filter library itself resides.[3] Thus, the "application filter library" and the "local operating system" are on the same platform; and the preamble recites that the "local operating system" is on "the incompatible computer platform." *Id.* at 17:30-31. Thus, the "second incompatible computer platform" is the same as "the incompatible computer platform." *See also id.* at 3:24-28 (explaining that the software application and runtime software run on the same "computer platform"). Indeed, for all its attorney arguments, Google cannot muster any written description support for its alternate "interpretation." *See* Resp. at 12-13.

Finally, the prosecution history, which Google ignores, also confirms VirtaMove's interpretation: the applicant used "second incompatible computer platform" to mean the single computer platform that is incompatible with the software application rather than a ***third*** computer platform that is additionally incompatible with the software application. *See* Br. at 11.

### 3. "the local operating system libraries"

As VirtaMove explained a POSITA would understand with reasonable certainty that "the local operating system libraries" refers to the one or more libraries of the "local operating system," i.e., the operating system running on the "incompatible computer platform." Br. at 12-13. Importantly, Google does ***not*** dispute that this is a reasonable interpretation. *See* Resp. at 13-14. Instead, it raises an alternative interpretation—that hypothetically the "libraries could be part of the set of files provided by step 17[a], in accordance with step 17[c]'s requirement that 'the at least one application filter library [be] ***provided in addition to the local operating system libraries***.'" *Id.* at 14 (emphasis Google's). This is incorrect: whereas the "set of files provided by step 17[a]" consists of files for the "first computer platform" on which the "first software application" is designed for execution, the "local operating system libraries" belong to the other computer platform, i.e., the "incompatible computer platform."

The claim language confirms that the files identified in step 17 a) consist of files for the "first computer platform" on which the "first software application" is designed for execution. Step

---

[3] *See, e.g.*, '762 Patent at 9:54-10:4 (managing the values returned by the OS to an application via system service filters), 10:5-13 (system service filters on the same platform as the OS), Abstract ("capsule runtime software includ[es] a kernel module and application libraries for modifying the behavior of ***the local [OS]*** residing on ***the incompatible computer platform***.").



RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

17 a) recites "a computer readable set of first files," comprising two "groups." The first "group" ("a first group of files"), which includes "the first software application," is "designed to execute on the first computer platform." Per the preamble, "the first computer platform" is the computer platform on which the "first software application" "is designed for execution." In other words, the "first group of files" are not designed for execution on the "incompatible computer platform." Similarly, the second "group" ("a second group of files") "are distributed with or are specific to an operating system required to execute the first software application." That is, the "second group of files" is for an operating system of the "first computer platform," not for the operating system of the "incompatible computer platform."

A POSITA would understand that, unlike the "first group of files" and the "second group of files," the "local operating system libraries" belong to the "incompatible computer platform." Grammatically, "the local operating system libraries" refers to "libraries" of the "local operating system." *See also* Br. at 12 n.2. And "the local operating system" is an operating system of the "incompatible computer platform." '762 Patent at cl. 17 preamble.

**4. "processor"**

Google's attempt to limit "processor" to a physical hardware embodiment ("a physical computer processor") should be rejected. The plain and ordinary meaning of "processor" encompasses virtual processors (or vCPUs).

***First,*** the intrinsic evidence does not define "processor" narrowly as a "physical computer processor." Although VirtaMove agreed that "processor" meant a physical computer processor in the context of '814 Patent claim 1, and the '762 Patent incorporates by reference the '814 Patent specification, it does not follow that the '762 Patent defines "processor" as a physical computer processor. The '762 and '814 Patents claim different inventions, and "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent." *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022) (internal citation and quotation omitted). "Rather, the disclosure of the host patent provides context to determine what impact, if any, a patent incorporated by reference will have on construction of the host patent claims." *Id.* (internal citation and quotation omitted). Here, the '814 and '058 Patents do not define "processor"

as a physical computer processor—Google merely identifies ***embodiments*** from the ’814 and ’058 Patents in which “processor” takes a hardware form. *See* Resp. at 14. Simply put, the specifications of the ’058 and ’814 Patents do not support reading “processor” narrowly as “physical computer processor,” let alone support such a narrowing in the context of the ’762 Patent specification (which Google’s brief does not deny uses “processor” as encompassing physical hardware and virtual embodiments (*see* Resp. at 15)).

Google’s reliance on *Omega Eng’g* and *Carnegie Mellon*, Resp. at 15, is misplaced. In *Omega Eng’g*, the patentee had made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent patent. *Omega Eng’g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). There is no such prosecution history disclaimer here, nor is there any lexicography; instead, Google cites only a *litigation stipulation* about the meaning of “processor” in a single claim of the ’814 Patent. There is no reason to import the same stipulation into the specification of the ’762 Patent, which uses “processor” broadly as encompassing both hardware and virtual embodiments. *See Finjan*, 51 F.4th at 1382 (“[T]he disclosure of the host patent provides context to determine what impact, if any, a patent incorporated by reference will have on construction of the host patent claims.”). *Carnegie Mellon* is inapposite, because as in *Omega Eng’g*, the ***intrinsic record*** led to a “construed meaning” that the court then applied to a related patent so as to maintain congruence between the intrinsic records of the two patents. *See Carnegie Mellon Univ. v. LSI Corp.*, No. 18-cv-04571, 2025 WL 2323347, at *5 (N.D. Cal. Aug. 12, 2025). Here, by contrast, a narrowing stipulation regarding claim 1 of the ’814 Patent need not be carried over into claim 17 of the ’762 Patent to maintain consistency between the two patents’ intrinsic records. The possibility of “jury confusion” (Resp. at 15) does not justify an improperly narrow construction; and here, it could be addressed with proper instructions.

***Second,*** Google incorrectly interprets the intrinsic record as excluding “virtual processors.” *See* Resp. at 15-16. Initially, Google relies on the ’814 Patent specification but does not explain how the disclosure in question applies to the invention disclosed in claim 17 of the ’762 Patent notwithstanding the incorporation by reference of the ’814 Patent into the ’762 Patent. Furthermore, the disclosure in question does not evidence any intent to ***exclude*** virtual processors

from the invention. The quote below makes clear that the applicant distinguished virtual machines from the inventions of the '814 Patent not based on whether a virtual processor could be used but instead based on the fact that virtual machines required multiple operating systems whereas the invention of the '814 Patent could run on a single operating system:

> Virtual Machine technology, pioneered by VmWare, offers the ability for multiple application/operating system images to effectively co-exist on a single compute platform. ***The key difference between the Virtual Machine approach and the approach described herein is that in the former an operating system, including files and a kernel, must be deployed for each application while the latter only requires one operating system regardless of the number of application containers deployed***.

'814 Patent at 1:53-61 (emphasis added). It is irrelevant that virtual machines use virtual processors. As to the invention of the '814 Patent generally, and those of the '762 Patent, the above disclosure does not state or imply that virtual processors cannot be used to run a single instance of an operating system that implements the inventions, nor does it imply that a virtual machine running on a physical processor cannot be an "incompatible computer platform including a processor" as claimed.

***Third,*** the dictionary definitions for "processor" cited by Google do not establish that a POSITA understands the plain and ordinary meaning of "processor" to be limited to a physical hardware embodiment. Two (*American Heritage Dictionary* and *New Webster's*) are general-purpose dictionaries (*see* Dkt. 191-1, 191-5) that are not authoritative sources in the relevant technical field and are not expected to provide all relevant technical nuance relevant to the understanding of a POSITA. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1375 (Fed. Cir. 2002) (preferring technical dictionary over a general-purpose dictionary as evidence of the meaning of a term in the relevant technical field). Indeed, a technical source cited by Google (the *Oxford Computer Dictionary*) does ***not*** limit "processor" to a physical embodiment, stating that "processor" is "***usually/often*** the 'central processor.'" Dkt. 191-6 at 4. Moreover, Google's own patents define "processor" as encompassing virtual processors. *See* Br. at 13-14. Google identifies no reason why the definition of "processors" in its own patents is inapplicable in the context of the '762 Patent specification. And Google's warning against use of its own patents as "extrinsic evidence" (Resp. at 16) misses the mark: Google does not argue that the intrinsic record



RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

defines "processor," so as to preclude applicability of extrinsic evidence. Indeed, Google has no problem relying on other "extrinsic evidence" (dictionary definitions) to construe the same term.

***Finally,*** to the extent Google faults VirtaMove for not proposing an express construction of "processor," the criticism lacks merit. Under *O2 Micro*, the Court should construe a claim term to the extent needed to resolve a specific fundamental dispute over the term. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Here, Google has raised a single dispute: whether "processor" is limited to a physical hardware embodiment (Google's position) or whether it also includes virtual processors (as VirtaMove has explained it does). *See* Br. at 13:10-18; Resp. at 14:11-16. There is no need for the Court to construe "processor" further or for VirtaMove to propose an express construction beyond what is required to resolve the present dispute. *See, e.g.*, *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016) (explaining that when a court resolves the parties' disputes over claim scope, it need not "address other potential ambiguities that have no bearing on the operative scope of the claim."). This is especially true here, where the claim term itself ("processor") appears in the concept of "virtual processor" which is the core of the dispute, such that there should be no confusion that the plain meaning of "processor" encompasses a "virtual processor."

**5. "normally used to perform a same task"**

As VirtaMove explained in its opening brief, Google's initial proposal was nonsensical and overly narrow, e.g., because it referenced a term ("corresponding capsule files") found nowhere in the specification or the claims. Br. at 15-16. In response, Google shifted its position and now argues that "[associated local system files] normally used to perform a same task" requires the files to be "superseded by a corresponding file in the 'second group of files'." Resp. at 16-17.

Google's new, revised proposal should also be rejected because it is nonsensical and overly narrow. It is nonsensical because, just like Google's original proposal, it relies on a term found nowhere in the claim or specification—this time, it is "the corresponding files." It is entirely unclear what "corresponding files" Google refers to, or how the jury could make such a determination when there is no antecedent basis (explicit or implicit) for these unspecified "corresponding files."

Google's new proposal is also overly narrow for two reasons. ***First,*** it ***excludes*** the possibility that, when the "second group of files" is present (which would ***necessarily*** include whatever unspecified "corresponding files" within the "second group of files" Google might intend its construction to refer to), the "file normally used to perform a same task" may actually be used to perform "a same task." The claim requires that the "second group of files" be used in place of the associated local system files "***in*** *the execution of the first software application,*" *see* '762 Patent at 18:5-10, but leaves open the possibility the "associated local system files" may be used to perform a same task ***outside*** *the context of the execution of the first software application*. Google's proposal improperly forecloses that possibility.

The correct understanding, as confirmed by the specification, is that the "second group of files" be used in place of "associated local system files" in executing the first software application. *See id.* at 6:54-56 (explaining that "[t]he files located in a capsule file set are used ***by application processes executing in a capsule environment*** instead of files located in the underlying OS," not that the files in a capsule file set are used for all tasks), 11:10-15 (application using "the same files it would use on its original [] platform" and not files supplied by the local operating system), 11:1-36 (same). Outside of the context of the execution of the first software application, e.g., for tasks run by the host operating system, the "associated local system files" may be used ***even if*** the second group of files is present.

***Second,*** Google's new proposal reads out essential claim language, as shown below:

> in the execution of the first software application on the incompatible computer platform using said second group of files in place of the associated local system files ~~normally used to perform a same task~~ **<u>that would be used if the corresponding files were not present in said second group of files</u>**, which are resident on the incompatible computer platform as part of the operating system . . .

This removes the requirement that the "associated local system files" "perform a same task." Instead, under Google's new proposal "associated local system files [] would be used" (and not necessarily "used to perform a same task") if some undefined "corresponding files" were not present in the second group of files, leaving undefined the tasks for which the associated local system files would be used.



RUSS, AUGUST & KABAT

**6. "runtime software"**

Google appears to agree that "runtime software" should take its plain and ordinary meaning, as it points to no express definition or disclaimer to support its proposed construction. *See* Resp. at 18-19. But Google's blind reliance on a single dictionary definition for the ordinary meaning of "runtime software" is misplaced, as Google makes no effort to ensure that its proposal fits the context of the '762 Patent. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1099 (Fed. Cir. 2020) (rejecting a proposal for the ordinary meaning of a claim term that was based on a textbook, given the usage of the claim term by the specification, and stating that "[w]hat matters is the meaning most appropriate in the context of the particular patent."); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014) (rejecting proposed plain and ordinary meaning based on dictionary definition because it contradicted the intrinsic record). Here, it is unclear what the construction conveys with "engine" and "managed software"; these terms are not used in the intrinsic record and are not defined by Google. Google's construction thus replaces one term that Google alleges requires construction ("runtime software") with at least two terms ("engine" and "managed software") that would separately require construction because their import is not apparent from the intrinsic record (unlike "runtime software" itself). Nor does Google explain how its proposed construction "is consistent with the operations performed by the runtime software" in the claim and the specification (Resp. at 19:9).

"Runtime software" should take its plain and ordinary meaning, not limited to "an engine that provides services to managed software." By its terms, and consistent with the intrinsic record, it is software that "manage[s] dynamic application state," e.g., by providing access to the set of files in a capsule containing the application and monitoring processes. *See* '762 Patent at 8:32-34, 8:67-9:2, 12:36-38. The "runtime software" filters system services and has services that "support system service filters both in user mode . . . within the capsule environment, and in kernel mode as a kernel module[.]" *Id.* at 6:23-26.

**7. "Modify"**

Google initially requested to construe only the single word "modify" without disputing the meaning of the clause in which the term appeared—*"modify values that otherwise would have*



RUSS, AUGUST & KABAT

*been returned by the local operating system in the absence of said filtering one or more system service requests from the first software application"* (the "Modify Clause"). *See* Resp. at 20-21; Dkt. 165 at 33; Dkt. 191-8 (Resp. Ex. H) at 1-2 (showing that the parties' dispute regarding "modify" only concerned whether "modify" is limited to "mak[ing] partial or minor changes to" or whether it includes "entirely replacing or substituting values"). Google now drops its proposed construction of "modify" but then expands the dispute to the construction of the ***entire*** Modify Clause, arguing the clause requires "first obtaining values that otherwise would have been returned by the local operating system, then modifying them using the at least one application filter library." Resp. at 20 (internal quotation marks removed). The requirement of "first obtaining values that otherwise would have been returned by the local operating system" is a new claim construction dispute not raised before, *see* Dkt. 191-8 at 1-2, and it is incorrect for Google to assert that VirtaMove has avoided addressing it. *See* Resp. at 21. The issue was never raised.

Substantively, Google's proposal should be rejected for contradicting the plain claim language and the specification. ***First,*** the Modify Clause, which uses the conditional construct "values that otherwise ***would have been*** returned . . . in the absence of said filtering," plainly states that the returned "values" belong to a ***hypothetical*** scenario in which the "filtering" is absent. Grammatically, using "would have been" to indicate hypotheticals is well established.

Google contends the Modify Clause requires actually obtaining values from the local operating system by contrasting the syntax of the clause with the hypothetical recited in element 17 b) (*"using said second group of files in place of the associated local system files normally used to perform a same task"*). *See* Resp. at 21. This is logically flawed: the syntax difference does not mean that the Modify Clause does not also recite a hypothetical, because the Modify Clause explicitly recites a hypothetical of "values that otherwise would have been returned." And Google does not explain why this hypothetical structure of the Modify Clause should not take its plain English meaning. Indeed, the specification uses the same grammatical construct of the Modify Clause elsewhere to discuss another hypothetical (one that would result in a software malfunction):

> providing to the computer platform for execution by the computer platform one or more encapsulated files, including the incompatible software application and runtime software for filtering requests to the kernel from the incompatible software

> application and or associated library files, that ***would otherwise result*** in a malfunction of the incompatible software application . . . .

'762 Patent at 3:24-33 (emphasis added). It does not make technical sense to interpret the "would otherwise result in a malfunction" language in the sense Google advocates for here, which would require that a "malfunction" actually result.

***Second,*** Google's new construction is unsupported by the specification. The patent teaches that a "system service filter is executed ***before*** the original system service," *id.* at 9:30-31, and that the "system service filter modifies one or more values returned by the OS to reflect capsule values rather than OS defined values" (*id.* at 10:9-11). Thus, the system service filter provides values instead of values the local OS would have returned if the original system service were to run. Google relies on the specification at 1:52-55 for support (Resp. at 2:15-17), but the passage does not speak to this question. Google also argues that the disclosure at column 10, lines 5-17 shows that the system service filter modifies values actually returned by the OS. Resp. at 21. As explained, that is not the correct interpretation. And it would not help Google even if it were, because the passage would not encompass the Modify Clause: whereas the specification states that "[t]he system service filter modifies one or more values ***returned by the OS*** . . .," *id.* at 10:9-10, the claim uses the hypothetical—"at least one application filter . . . to modify values that ***otherwise would have been returned by the [OS]***."

**8. "process context" (Claim 18)**

Once again, Google provides no cognizable reason to import a "definition" drawn from an online magazine article into the claim. Google cites no intrinsic evidence at all, and its only case cite is in support of a vague accusation that VirtaMove, by refusing to agree to Google's baseless construction, must be intending to present an improper argument to the jury. Resp. at 22:19-20.

Google's revised proposal makes even less sense than the original; it now requires the application filter library to execute in the running state of the *runtime software*, rather than the process context of the *process which requests a service*, as claimed. Google also reads "process" out of "process context." The claim requires the application filter library to run in the process context of the specific "process which requests a service," not (as Google's proposal may imply) the context of some potentially broader "software" or "runtime software."



RUSS, AUGUST & KABAT

Dated: August 28, 2026

Respectfully,

/s/ Reza Mirzaie
Marc Fenster (SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
rmirzaie@raklaw.com
Neil A. Rubin (SBN 250761
nrubin@raklaw.com
Jacob Buczko (SBN 269408)
jbuczko@raklaw.com
Ali-Reza Boloori (SBN 271489)
aboloori@raklaw.com
James A. Milkey (SBN 281283)
jmilkey@raklaw.com
James Tsuei (SBN 285530)
jtsuei@raklaw.com
Christian Conkle (SBN 306374)
cconkle@raklaw.com
Qi (Peter) Tong (SBN 300347)
ptong@raklaw.com
Jonathan Ma (SBN 312773)
jma@raklaw.com
Daniel Kolko (SBN 341680)
dkolko@raklaw.com
Mackenzie Paladino (pro hac vice)
mpaladino@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-9226

*Attorneys for Plaintiff VirtaMove Corp.*